857 F.2d 1474
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Johnny B. FLETCHER and wife, Peggy M. Fletcher, Plaintiffs-Appellants,
v.
POOLE TRUCK LINE, INC. and James McMillion, Defendants-Appellees.
 No. 87-5989.
 United States Court of Appeals, Sixth Circuit.
 Sept. 9, 1988.
 
 Before BOYCE F. MARTIN, Jr., RALPH B. GUY, Jr., and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiffs brought suit against defendant seeking damages for personal injuries incurred by one of the plaintiffs as the result of a motor vehicle collision between that plaintiff and an employee of the defendant. A unanimous jury found by general verdict that plaintiffs were not entitled to recover damages from defendant, and the district court denied the plaintiffs' subsequent motion for a new trial. Plaintiffs now appeal, arguing that the jury's verdict is not supported by the evidence, that the plaintiffs did not receive a fair hearing, that the trial court erred in allowing the introduction of certain hearsay testimony, and that the district court inaccurately instructed the jury with regard to the relevant law. For the reasons set forth below, we affirm the district court's denial of the plaintiffs' motion for a new trial.
 
 I.
 
 2
 Plaintiffs filed this diversity action in the United States District Court, Eastern District of Tennessee, seeking damages for personal injuries arising out of a collision between plaintiff Johnny B. Fletcher's[1] pickup truck and an 18-wheel tractor-trailer rig. The accident occurred at approximately 10:30 a.m. on Monday, July 1, 1985, on Highway 68 in Rhea County, Tennessee. Highway 68 is a two-lane highway and the accident in question occurred approximately three miles east of Highway 27 at the intersection of Highway 68 and Cunningham Subdivision Road. Plaintiff was driving eastbound in his pickup truck on Highway 68. James McMillion, driver of the tractor-trailer, was maneuvering his vehicle out of the parking lot of The Beer Joint, which is a business establishment located on the north side of Highway 68, and was headed south crossing Highway 68 into Cunningham Subdivision Road. The tractor-trailer driven by McMillion was owned by defendant, Poole Truck Line, Inc., (hereinafter referred to as Poole).[2] According to plaintiff, when McMillion was driving the tractor-trailer and the accident occurred, McMillion was an agent acting within the scope of his employment by Poole. Plaintiff contended further that the proximate cause of both the accident and resulting damages was the negligence of McMillion as agent for Poole, without fault or negligence on the part of plaintiff.
 
 
 3
 In its answer to plaintiff's complaint filed below, Poole denied that McMillion was acting within the course and scope of his employment at the time of the accident and, therefore, denied that it could be held liable for any alleged negligence of McMillion. Poole further denied that McMillion was negligent and averred that it was the negligence of plaintiff which was the proximate cause of the accident. Finally, Poole denied the existence of plaintiff's injuries and plaintiff's entitlement to any damages. Pursuant to a consent order, the case was referred to a magistrate. On April 30, 1987, trial was held before the magistrate and a six-member jury.
 
 
 4
 The testimony introduced at trial indicates that plaintiff's line of sight, or depth of perception, as he approached the accident scene was at least 2,000 feet. The stretch of Highway 68 in question is straight and level and there were no obstructions to plaintiff's vision as he approached the point of the accident. The combined width of both lanes of Highway 68 at the site of the accident is 22 feet, 6 inches. Plaintiff testified that he first saw the tractor-trailer when it began pulling out of The Beer Joint, approximately 200 feet in front of him. From the time plaintiff first saw the tractor-trailer until the collision occurred, the tractor-trailer had crossed the west-bound lane of the highway. Plaintiff's pickup truck struck the fuel tank on the passenger side of the tractor in the middle of the east-bound lane. Following the collision, the driver of the tractor-trailer and plaintiff had a conversation immediately after which the tractor-trailer driver maneuvered his rig up the road in order to get off Highway 68, dragging along plaintiff's heavily damaged pickup truck. Afterwards, the tractor-trailer driver told plaintiff that he lived in the subdivision up the hill and that he would go "call the law." Plaintiff never saw the tractor-trailer driver again.
 
 
 5
 Soon after the collision and the disappearance of McMillion, Trooper Laxton of the Tennessee Highway Patrol arrived on the scene. Trooper Laxton was of the opinion that the vehicle on the highway, which in this instance was plaintiff's pickup truck, had the right-of-way. Trooper Laxton testified that upon his arrival at the accident site, plaintiff did not complain of any personal injury, and was basically concerned about the property damage to his pickup truck. Trooper Laxton telephoned Poole Truck Lines in Evergreen, Alabama, in order to report the accident. Tommy Hartley, Poole's central dispatcher, took the call. This was Poole's first indication that its vehicle was involved in an accident. At that time, Hartley informed Trooper Laxton that James McMillion had been the driver of the tractor-trailer.
 
 
 6
 On June 29, 1985, two days prior to the accident, Hartley had dispatched McMillion into the Nashville terminal of Poole Truck Lines. In Nashville, McMillion picked up a load of steel to be shipped to Atlanta, Georgia, for arrival on Monday, July 1, 1985, between 7 o'clock a.m. and 7:30 a.m. Thereafter, the Nashville terminal dispatched McMillion on his route to Atlanta. During the course of his testimony, Hartley introduced McMillion's daily log for June 29, 1985, which showed that McMillion's assigned route from Nashville to Atlanta was via Interstate 24 east to Chattanooga, picking up Interstate 75 south to Atlanta. There were no scheduled stops between Nashville and Atlanta. Hartley testified that it was Poole's policy to require its drivers to travel interstate highways whenever possible. At the time of the accident, McMillion was on a two-lane state highway, 62 miles out of route, and headed toward a residential subdivision. Hartley also introduced a list of company procedures acknowledged in writing by McMillion when he was hired on May 7, 1985, approximately seven weeks before the accident. These procedures specify that employees may not drive a truck home without permission, a penalty of 60 cents per mile is charged for any out-of-route miles, the driver must report all accidents immediately by telephone and that failure to do so may result in immediate termination, and that a driver's departure from the scene of an accident may result in a disqualification from driving.
 
 
 7
 Poole's risk manager, Richard Jenkins, testified at trial that he had spoken to plaintiff on the day after the accident, but later began corresponding with an attorney retained by plaintiff. Jenkins further testified that he communicated only with the plaintiff's attorney until plaintiff telephoned Jenkins "probably some six weeks later and said that he had fired that lawyer...." Jenkins also stated that when he asked plaintiff whether plaintiff felt as if he would be able to return to work, plaintiff told Jenkins that he was "100% disabled" and that he wanted Poole "to send him to college."
 
 
 8
 With regard to plaintiff's physical injuries, plaintiff testified that while at the scene of the accident, he was not aware that he had been injured. Later that same afternoon, however, his neck and back and left shoulder began to ache. X-rays taken at the emergency room on the day of the accident were normal, as were each of the three subsequent sets of x-rays taken prior to the date of trial.[3]
 
 
 9
 On January 8, 1986, plaintiff completed a federal workers compensation form at the Tennessee Valley Authority, his employer, and reported only that he had received a "sprain of the left shoulder" as a result of the July 1985 collision, with no mention of any back injury.[4] Also introduced at trial was the testimony of Jack Good, an individual who had been hired by Poole to investigate the accident. According to Good, on April 24, 1986 (nine months after the accident), he observed plaintiff "picking up loose garbage and one thing and another around the yard putting it in a garbage can beside his garage." The garbage can was "almost the size of a 55-gallon drum. Some of the lumber pieces were sticking up out of it, but it was at least a 50-gallon garbage can." According to Good, plaintiff picked up the filled garbage can and lifted it "over the tailgate and set it in the back of the truck." He travelled to a local dumpster, "got out of his truck, picked up the garbage can back over the tailgate of the truck and lifted it up and poured it into the dumpster, shook it out and put it back in the truck and went back home." Good explained further that the dumpster into which he saw plaintiff shake the garbage can contents was about five feet high. (App. at 203-04). On February 11, 1987, Dr. Davis, a neurosurgeon, examined the plaintiff and reported that all tests were normal.
 
 
 10
 Plaintiff testified that at the time of trial, he felt like a total loss because of the pain in his back, neck, shoulder and arms.
 
 
 11
 At the close of the proofs[5] and arguments before the jury, a unanimous jury found by general verdict that plaintiff was not entitled to a recovery of damages from defendant. Thereafter, plaintiff filed a motion for a new trial. Fed.R.Civ.P. 59. By memorandum and order entered July 16, 1987, the district court denied plaintiff's motion. Plaintiff now appeals the district court's order denying plaintiff's motion for a new trial. In so doing, plaintiff makes the following claims: (A) The weight of the evidence is contrary to the verdict; (B) plaintiff was denied a fair trial when the defendant presented objectionable evidence of settlement negotiations between the parties and also indicated that plaintiff had fired his original attorney; (C) the trial court erred by allowing hearsay evidence concerning McMillion's assigned route between Nashville and Atlanta; and (D) the trial court erred by not giving the specific jury charge requested by plaintiff concerning the issue of respondeat superior. We shall address each of plaintiff's claims on appeal seriatim.
 
 II.
 
 12
 A. Whether the jury's verdict is against the clear weight of the evidence.
 
 
 13
 The law is clear that the question of the sufficiency of the evidence in a federal diversity case is a federal procedural question. As this court recently stated in Williams v. Union Carbide Corp., 790 F.2d 552, 554 (6th Cir.1986):
 
 
 14
 Federal law leaves the decision of whether to reject a jury's verdict to the sound discretion of the trial judge. Toth [v. Yoder, 749 F.2d 1190,] 1197 [ (6th Cir.1984) ]. A trial judge cannot substitute his own judgment for that of the jury except when the jury's verdict is against the clear weight of the evidence. A jury's verdict that could have reasonably been reached should be left undisturbed. Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir.1982); TCP Industries, Inc. v. Uniroyal, Inc., 661 F.2d 542, 546 (6th Cir.1981).
 
 
 15
 Moreover, "[w]ith respect to the applicable scope of review of a District Court decision granting or denying a new trial on the basis of the weight of the evidence, it is well settled that reversal may be predicated only upon an abuse of discretion." Duncan v. Duncan, 377 F.2d 49, 53 (6th Cir.), cert. denied, 389 U.S. 913 (1967). "Thus, the district court is afforded broad discretion in ruling on new trial motions." Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir.1982), cert. denied, 459 U.S. 1171 (1983) (citations omitted). With these standards in mind, we shall review the trial court's determination that "[t]here was ample evidence from which the jury could have reached the conclusion that it did." (App. at 45).
 
 
 16
 The jury returned a general verdict finding that plaintiff was not entitled to collect damages from Poole for plaintiff's personal injuries. Neither a special verdict request or special interrogatories were submitted to the jury. Left with only a general verdict, the specific ground(s) upon which the jury based its decision cannot be ascertained. The jury could have based its verdict on any one or more of the following conclusions: (1) that McMillion was acting outside the scope of his employment at the time of the accident and that, therefore, his employer, Poole, was not liable for any damages caused by McMillion; (2) that even if McMillion was acting within the scope of his employment, either he was not negligent or plaintiff was contributorily negligent; and (3) even if McMillion was acting within the scope of his employment, plaintiff sustained no actual injury.
 
 
 17
 This is a diversity case in which state-created rights are sought to be enforced. In such instances, a general verdict is to be construed as a state court would construe it. Adkins v. Ford Motor Co., 446 F.2d 1105, 1108 (6th Cir.1971). Tennessee Code Ann. sections 20-9-502 and 20-9-503 provide as follows:
 
 
 18
 20-9-502. Verdict applied to good account. --If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts.
 
 
 19
 20-9-503. Scope of general verdict. --A general verdict, although it may not in terms answer every issue joined, is nevertheless held to embrace every issue, unless exception is taken at the term at which the verdict is rendered.
 
 
 20
 The case of Hammons v. Walker Hauling Co., 263 S.W.2d 753, 755 (Tenn.1953), discusses Tenn.Code Ann. Sec. 20-9-503 (formerly Code Section 10343) as follows:
 
 
 21
 The purpose of this Code Section, in so far as it refers to defendants whose liabilities are being considered by the jury, is to require the application of such general verdict in favor of such defendants to such defensive plea of such defendants as is supported by evidence though there be other pleas not so supported.
 
 
 22
 (citation omitted). See also Clinard v. Pennington, 438 S.W.2d 748, 750 (Tenn.Ct.App.1968) ("[t]he purpose of the statute is to require the application of a general verdict for the defendant to each defensive plea which is supported by the evidence"). As this court previously noted in Adkins: "Tennessee adheres to the rule that where more than one theory of recovery is submitted to the jury, and there is evidence to support one or more, but not all, of the theories, a general verdict should be construed to be attributable to the theory or theories supported by sufficient evidence and submitted free from error." 446 F.2d at 1108 (citations omitted). Accord Tracy v. Finn Equipment Co., 290 F.2d 498 (6th Cir.1961).
 
 
 23
 Upon review of the record, we agree with the district court's conclusion that the jury's verdict is not in conflict with the clear weight of the evidence. During the course of trial, persuasive and frequently uncontradicted testimony and evidence were introduced which could lead reasonable minds to conclude that plaintiff was not entitled to collect damages from defendant because (1) driver McMillion was not acting within the scope of his employment at the time of the accident; and/or (2) that the accident was not caused by McMillion's negligence or that plaintiff was contributorily negligent; and/or (3) that plaintiff had not sustained injuries. The evidence introduced at trial included, among other things: (1) a list of Poole Company procedures, executed by McMillion, forbidding personal use of Poole vehicles without company permission; (2) testimony that at the time of the accident, the highway was flat and clear with approximately 2,000 feet of visibility and that plaintiff first noticed defendant's truck at a distance of 200 feet; and (3) medical reports which did not support the gravity of plaintiff's complaints of physical injury resulting from the collision. Accordingly, we conclude that the district court properly exercised its discretion in overruling plaintiff's challenge to the jury's verdict as contrary to the weight of the evidence.
 
 
 24
 B. Whether plaintiff was denied a fair trial when one of the defendant's witnesses stated that plaintiff had fired his original attorney and that plaintiff wanted Poole "to send him to college."
 
 
 25
 During the direct examination of Poole's risk manager, Richard Jenkins, Poole's attorney asked Jenkins the following question: "How many times did you talk to him [plaintiff] on the telephone, would you estimate?" Jenkins replied: "I probably talked to him on two or three occasions up to the point I received a letter from a lawyer and then I didn't make any more contact. I respect the lawyer's right to privacy of his client, of course, I made no further contact, but then he called me some, maybe some six weeks later and said that he had fired that lawyer...." Plaintiff's attorney objected and the court instructed the jury to disregard this answer. Immediately thereafter, Poole's attorney inquired: "Let me go on to something else. In discussing the claim itself with him [plaintiff], did you discuss with him whether or not he was able to work?" Jenkins replied as follows: "Yes, sir. He told me that he could not go back to his job at TVA with this type of disability and that he felt he was 100 percent disabled and he wanted me to send him to college." At this time, the attorneys for both plaintiff and defendant approached the bench and a brief conference ensued, after which the court instructed the jury as follows:
 
 
 26
 Ladies and gentlemen of the jury, with regard to the last questions that were asked and the answers given with regard to what might be proceeding to a settlement negotiation between the parties, I am going to instruct you to disregard in the entirety the questions and answers in that regard.
 
 
 27
 (App. at 197). Plaintiff now argues on appeal that Jenkins' testimony was highly prejudicial and disclosed settlement negotiations in violation of Fed.R.Evid. 408, and that plaintiff was thereby denied his right to a fair trial.
 
 
 28
 In addressing this issue in the July 16, 1987, order denying plaintiff's motion for a new trial, the district court concluded that introduction of the testimony concerning the possibility of a future college education was not appropriate, but that any possible prejudice to the plaintiff was cured by the court's instruction to disregard the testimony. With regard to the testimony that plaintiff had fired his prior attorney, the trial court concluded that no actual prejudice to the plaintiff occurred which would necessitate a new trial. (App. at 46-47).
 
 
 29
 By virtue of his presence at trial, the trial judge's assessment of the effect of any statement on the jury is accorded great deference. So too is the trial judge's conclusion that any admonition to the jury to disregard any such remark is sufficient to cure potential prejudice. The only authority relied upon by plaintiff in challenging the district court's ruling on this issue is Fleet Carrier Corp. v. Lahere, 132 A.2d 723, 724, 184 P.A.Super. 201, 204 (1957). In Fleet Carrier, the court held that a new trial must be held because counsel had stated during closing argument: "I assure you that notwithstanding what was argued to you, no difference what Mr. McCandless said or how large your verdict, I assure you that Mr. Lahere will not have to pay one cent of it." The Fleet Carrier case deals with the situation where an attorney subjects insurance into the case in closing arguments. That is not the situation presented by the case before the court, and Fleet Carrier does not provide authority in this matter.
 
 
 30
 We agree with the district court's assessment of the impact of Jenkins' testimony upon the jury. Further, in light of the existence of the curative instruction and the abundance of evidence contained in the record which supports the jury's verdict, we uphold the trial court's decision to overrule plaintiff's motion for a new trial on these grounds.
 
 
 31
 C. Whether the trial court committed reversible error by allowing the introduction of certain evidence concerning the propriety of driver McMillion's route from Nashville to Atlanta.
 
 
 32
 Plaintiff contends that the district court committed reversible error by allowing driver McMillion's chief dispatcher, Tommy Hartley, to testify concerning the route assigned to McMillion by the terminal manager in Nashville, Tennessee. We note at the outset that our discussion of the issue may be purely academic because plaintiff has failed to establish any connection between the evidence relating to the agency issue and the jury's general verdict and, as we discussed in Part A of the opinion, the evidence supports a verdict based on grounds other than the existence of the agency relationship. Nevertheless, in the interest of completeness, we shall proceed to address this issue. In ruling upon plaintiff's motion for a new trial, the trial court agreed with plaintiff that it was error to admit Hartley's challenged hearsay testimony but concluded that such admission constituted no more than harmless error. Fed.R.Civ.P. 61. (App. at 48). In so finding, the district court reasoned that in light of the other properly admitted evidence supporting the assertion that McMillion's designated route was from Nashville to Chattanooga on I-24 and from Chattanooga to Atlanta on I-75, and that McMillion was not to deviate from that route, the challenged evidence was merely cumulative.
 
 
 33
 During the course of trial, McMillion's signed daily log of June 29, 1985, was introduced, without objection, showing that the route assigned was Interstate 24 (the "entry highway") from Nashville to Chattanooga and that there were to be no stops between Nashville and Atlanta. (App. at 246). Also admitted, without objection, were portions of McMillion's personnel file including manuals, signed by McMillion, which set forth company policy against deviation from assigned routes and company rules against departure from the scene of an accident, failure to report an accident, and taking a truck home without permission. In light of the existence of this evidence, we agree with the district court's conclusion that introduction of Hartley's challenged testimony was harmless because "there was more than adequate evidence from which the jury could have found that James McMillion was outside the course and scope of his employment at the time of the accident, with or without the admission of the hearsay statement." (App. at 49-50). We therefore conclude that no substantial right of plaintiff was affected by introduction of this testimony, and uphold the district court's decision to overrule plaintiff's motion for a new trial on this ground.
 
 
 34
 D. Whether the district court erred by using a charge other than the plaintiff's requested jury charge concerning the issue of respondeat superior.
 
 
 35
 Plaintiff's final claim on appeal is that the district court erred by not using plaintiff's requested charge concerning the issue of respondeat superior. Plaintiff's requested charge reads in pertinent part as follows:
 
 
 36
 If the work of the employer creates the necessity for travel, the employee is in the course of his employment, though he is serving at the same time some purpose of his own. If, however, the work is merely incidental to the travel and the trip would not have been made but for the private purpose of the servant or employee, he is out of the scope of his employment in making it. Leeper Hardware Co., Inc. v. Kinney Kirk et al., 434 S.W.2d 620 (1968), cert. denied 1968.
 
 
 37
 (App. at 35). In lieu of plaintiff's proposed instruction, the district court gave four instructions concerning the agency issue, taken from the Tennessee Pattern Jury Instructions--Civil Secs. 12.01, 12.02, 12.03 and 12.06. With regard to the law as it relates to an agent attending to personal affairs and his employer's liability during such time, the district court specifically instructed the jury in accordance with Sec. 12.03 as follows:
 
 
 38
 All right. Now, with regard to scope of authority. It is not necessary that a particular act or failure to act be expressly authorized by the principal to bring it within the scope of the agent's employment. Such conduct is within the scope of employment if it occurs while the agent is engaged in the duties which he was employed to perform and it relates to those duties. Conduct for the benefit of the principal or master which is incidental to, customarily connected with or reasonably necessary for the performance of an authorized act is within the scope of an agent's employment.
 
 
 39
 Let's talk about limitations on scope of employment now. When an agent is acting on his principal's behalf and within the scope of his authority, if while so engaged he also and incidentally attends to some matters strictly personal to himself, his doing so does not break the agency relationship so as to release the principal from responsibility for the agent's conduct.
 
 
 40
 On the other hand, when an agent departs or substantially deviates from the business or service of his principal, and pursues some activity or object not for his principal and not reasonably embraced within his employment, the principal is not responsible for anything done or not done in such activity. This is true even though in such personal affairs the agent uses the principal's property and causes an injury through facilities that have been entrusted to him by the principal.
 
 
 41
 (App. at 228-29). In addition, and in spite of the fact that plaintiff failed to request an instruction concerning ownership of the truck in question, the trial court instructed the jury concerning the presumption of ownership and presumption of agency pursuant to Tenn.Code Ann. Secs. 55-10-311 and 55-10-312.
 
 
 42
 A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law. The instructions given by the trial court derive directly from the standard jury instructions of Tennessee and accurately reflect the law of that state. Further, this court has expressly stated that "we believe that it is the better practice for the federal courts to use the state approved instructions in diversity cases." Williams v. Union Carbide Corp., 790 F.2d 552, 557 (6th Cir.1986). This was precisely the course of action followed by the district court. We therefore conclude that the trial court properly overruled plaintiff's motion for a new trial on this ground.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 The other plaintiff, Peggy M. Fletcher, or Mrs. Johnny B. Fletcher, who was not in her husband's pickup truck at the time of the collision, sues for loss of her husband's services and consortium. Since Mrs. Fletcher's cause of action derives from her husband's claims, for purposes of simplicity we will hereinafter refer in the text of this opinion only to plaintiff, Johnny B. Fletcher
 
 
 [2]
 Plaintiffs sued James McMillion but never obtained proper service of process. On February 3, 1987, the district court quashed the service of process on McMillion; thus, McMillion is not a party to this appeal
 
 
 [3]
 The x-rays did give some indication of arthritis unrelated to the accident
 
 
 [4]
 Plaintiff testified that beginning on November 25, 1985, he began to receive disability payments through his employment at the Tennessee Valley Authority due to an unrelated job injury he had suffered in 1983 which left his hearing permanently impaired. Plaintiff was placed on federal workers compensation at the rate of 75 percent of his wages. He was also enrolled at Surrey Community College in North Carolina studying electronics with the expenses being paid by federal workers compensation
 
 
 [5]
 Counsel for defendant moved for a directed verdict at the close of the plaintiff's case-in-chief and renewed that motion at the close of all of the proofs. Both of these motions were denied by the trial court, which applied the directed verdict standard of Tennessee. In the trial court's July 16, 1987, order denying plaintiff's motion for new trial, however, the district court stated in a footnote that upon reexamination of the Tennessee law of directed verdicts:
 After careful review of the evidence presented at trial, it is this court's position that a directed verdict should have properly been directed in defendant's favor at the close of the proofs. See Homes v. Wilson, 551 S.W.2d 682, 685 (Tenn.1977). Further, had the jury returned a verdict in the plaintiff's favor, the Court would not have let the verdict stand.