RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0040P (6th Cir.)
File Name: 02a0040p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RANDALL CRAIG COBB, a/k/a
Randall "Tex" Cobb,
   *Plaintiff-Appellee,*

   *v.*

TIME, INC., d/b/a Sports
Illustrated,
   *Defendant-Appellant.*

No. 00-5159

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 94-00836—Robert L. Echols, Chief District Judge.

Argued: December 5, 2001

Decided and Filed: January 30, 2002

Before: KENNEDY, MOORE, and COLE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Floyd Abrams, CAHILL, GORDON &
REINDEL, New York, New York, for Appellant. George
Bochetto, BOCHETTO & LENTZ, Philadelphia,
Pennsylvania, for Appellee. **ON BRIEF:** Floyd Abrams,
CAHILL, GORDON & REINDEL, New York, New York, for

1

Appellant.  George Bochetto, David J. Perlman, BOCHETTO & LENTZ, Philadelphia, Pennsylvania, for Appellee.  Laura Handman, DAVIS, WRIGHT & TREMAINE, Washington, D.C., for Amici Curiae.

––––––––––––––––

## OPINION

––––––––––––––––

KENNEDY, Circuit Judge.  Plaintiff Randall "Tex" Cobb, a former professional boxer and character actor, sued defendant Time, Inc. d/b/a *Sports Illustrated* ("*SI*") for libel. The action arose out of an article that appeared in the October 4, 1993 edition of the publication *Sports Illustrated*, a prominent national sports magazine.  The article, entitled "The Fix Was In," dealt with a number of professional boxing matches involving boxing promoter Rick "Elvis" Parker in which the outcomes were allegedly prearranged.  The primary example was a match involving Cobb and a boxer named Paul "Sonny" Barch which took place on September 15, 1992.  The article published Barch's account of the events surrounding the match, including claims that Barch and Cobb had agreed that Barch would "take a dive" in the first round, that Cobb had discussed with Barch how this would play out in the ring, and that Parker, Cobb, and Barch had used cocaine together the night before the match and again shortly after the match. After trial, the jury returned a verdict in favor of Cobb for $8.5 million in compensatory damages and $2.2 million in punitive damages.  Defendant filed a Renewed Motion for Judgment as a Matter of Law or in the Alternative for a New Trial or Remittitur, which was denied by the district court. Defendant appeals.  For the reasons set forth below, we reverse the judgment of the district court and remand for entry of judgment in favor of defendant.

## I.  Procedural History

In 1993, *Sports Illustrated* published an article implicating Cobb as a participant in a "fixed" (or "arranged") boxing match.  The article also suggested that Cobb had used cocaine

with his opponent, Sonny Barch, and the promoter, Rick Parker. The article was based largely on statements given by Barch to *SI* reporters. Cobb sued *SI* for libel. *SI* filed a motion for summary judgment, which was granted in part and denied in part. The court ruled that *SI* could not be held liable for certain statements contained in the article because there was no evidence of "actual malice," as required in a public figure libel case, with respect to those statements. First, the court held that *SI* could not be liable for the statement that the fight had been fixed, because *SI* possessed evidence, other than Barch's account, that corroborated that statement. Next, the court determined that Cobb's claim must fail as to a statement in the article that Cobb had told Barch prior to the fight that he had a shoulder injury because that statement was substantially true. Cobb had argued to the district court that he did not, in fact, have such an injury, but rather had a rib injury. The court, in granting summary judgment as to this statement, noted: "The point is that [Cobb] entered a boxing match knowing that he had an injury which would likely impair his ability to box." (J.A. at 407.) Finally, the court granted summary judgment as to an implication in the article that Cobb had tested positive for cocaine after the fight. Cobb conceded that he was suspended for testing positive for marijuana use, but denied that he ever tested positive for cocaine use. The wording of the article, however, made it seem as though Cobb's positive test was for cocaine use. Nonetheless, the court concluded that the implication was substantially true, because the "sting" of the statement was "that a professional boxer ingested an illegal drug prior to fighting and that such drug would likely affect his ability to box." (J.A. at 408.)

The court denied summary judgment, however, as to two statements in the article. First, that Cobb had knowingly participated in the fixed fight (since Barch could have agreed to "take a dive" without Cobb's knowledge or participation in the scheme). Second, that Cobb had used cocaine with Barch *after* the fight. The jury was permitted to consider Cobb's libel claim insofar as it was based on these two statements, and returned a verdict in Cobb's favor. The trial court then

denied *SI*'s renewed motion for judgment as a matter of law or for a new trial or for remittitur and entered judgment in favor of Cobb.  *SI* appeals.

## II.  Factual Background

Because this court is required to independently review the evidence of "actual malice," discussed below, a detailed review of the *SI* investigation is necessary.  In September, 1993, *SI* senior editor Steve Robinson received an unsolicited telephone call from a relatively unknown boxer named Sonny Barch.  Barch told Robinson that he had participated in a fixed fight promoted by Parker in Fort Lauderdale, Florida in 1992.  Barch told Robinson that he had given sworn testimony to Don Hazelton, the Executive Director of the Florida State Athletic Commission ("FSAC"), regarding this fight, as well as another fixed fight that Barch had been involved with as a manager.  Barch asked Robinson if he could be paid for giving *SI* his story.  Robinson told Barch that *SI* would not pay for information, but that it would pay for a first-person account of events, if Barch's story checked out.  Robinson and Barch agreed that *SI* would pay Barch $1000 to hold the story from other publications for ten days so that *SI* could investigate.  Robinson promised Barch an additional $14,000 at the end of the ten day period if the story checked out.

This story was not "hot news."  Nothing about it required immediate dissemination.  However, the *SI* reporters planned to investigate the story within the 10 day deadline and "close" on the story in time to publish it in the October 4 issue.  Robinson's first step was to call Don Hazelton, the Executive Director of the FSAC.  There is no dispute about Hazelton's credentials.  He had been the director of the FSAC for nearly five years, had attended the Cobb-Barch match and every other boxing match in Florida during his tenure, had conducted an investigation of the match in question, and had previously served as the president of the National Association of Boxing Commissions and the North American Boxing Union, as well as the Executive Director of the International

argument that *SI* should have interviewed the referee and the ringside officials tends to show that *SI* might not have acted as a prudent reporter would have acted.  But the actual malice standard requires more than just proof of negligence.  It requires a reckless disregard for the truth.  The record does not support the conclusion that *SI* intentionally avoided learning the truth, unlike the defendants in *Harte-Hanks* and *Butts*.  The jury's verdict cannot stand without significantly infringing on the "breathing space" that the Court has carved out for the freedom of speech.

## IV.

Because we find that the record does not support a finding of actual malice, we need not address defendant's additional arguments.  For the foregoing reasons, we reverse the district court's order and judgment, and remand for entry of judgment in favor of the defendant.

with the informer at the time he overheard the call, 2) failed to examine the informer's notes that were taken at the time of the phone call, 3) failed to consult with anyone knowledgeable in the sport (the magazine was not a sports publication), and 4) did not screen the film of the game or attempt to find out if the opposing team had adjusted its game plan after the purported phone call.

We conclude that the record in this case reveals undisputed facts which make it readily distinguishable from the *Harte-Hanks* and *Butts* cases. Unlike the *Harte-Hanks* case, in this case the *SI* reporters did obtain information from at least one independent source corroborating Barch's story. *SI* interviewed Hazelton, undoubtedly a boxing expert, who told them that the fight tape seemed to confirm Barch's story. Hazelton also told the *SI* reporters that Cobb arrived very late for the fight, which he found suspicious. Most importantly, Hazelton told them that he thought that Cobb's performance "lacked enthusiasm." While not directly stating, in so many words, that Cobb was knowingly participating in the fix, Hazelton provided powerful corroboration for Barch's story. Although *SI* did not interview the referee or the ringside officials, Hazelton did tell *SI* that he spoke with the ringside officials who agreed that the outcome was pre-determined. In addition, several *SI* journalists, two of whom had significant experience covering the sport of boxing, viewed the tape and arrived at the conclusion that Cobb had been in on the fix. While the *SI* journalists are obviously not independent experts, their conclusions after viewing the videotape provided *SI* with further reason to believe Barch's story.

The differences between *Butts* and the present case are obvious. In *Butts*, nobody -- not even the journalists -- viewed the game film to corroborate the informer's story. The defendant did not consult with a single person knowledgeable in the sport of football or show the film to such an expert. The defendant did not have an independent witness, like Hazelton, to corroborate the story. In short, the investigation in the present case was far more comprehensive than the investigation in either *Harte-Hanks* or *Butts*. Cobb's

Boxing Organization. Hazelton told Robinson that Barch had indeed given sworn testimony to the FSAC about the Cobb-Barch match and the "improprieties as far as that fight was concerned." (J.A. at 1546.) Hazelton also told Robinson that it was his opinion that the fight had been fixed. Robinson then spoke with Marty Dardis, an *SI* investigator who knew Hazelton and confirmed that he was a reliable source.

Robinson's next step was to assign Sonja Steptoe to investigate the story. Steptoe had over eight years of reporting experience for the *Wall Street Journal* and *SI*, but was not a boxing expert. Steptoe conducted a lengthy interview of Hazelton in person. Hazelton told Steptoe that Parker was a promoter with a reputation for corrupt practices. Hazelton then told Steptoe about the fight in question. Hazelton said that the fight was originally scheduled to feature Cobb versus a boxer named Tim Anderson. When Hazelton arrived at the weigh-in, however, Parker sought to substitute Barch for Anderson. Parker told Hazelton that he preferred Barch because "he couldn't trust Anderson." (J.A. at 1523.) Hazelton also stated that Parker had complained that Anderson was refusing to fight unless he got paid more than $2500. Hazelton, however, said that he spoke to Anderson, who told Hazelton that he was willing to fight for $2500 or less.

Hazelton also told Steptoe that he saw Cobb arrive at the venue very late – only twenty minutes before the fights were to begin. Cobb claims that this was due to the transportation arrangements made by the promoter. (J.A. at 1160-61.) Hazelton also told Steptoe that Barch appeared "bone dry" when he stepped into the ring – a sign that he had not warmed up before the fight. (J.A. at 1528.) Hazelton also found it odd that Barch did not have anyone working in his corner. Hazelton and Steptoe then watched the fight film, and Hazelton told Steptoe that Barch's performance was one of the worst he had seen. He told her that he thought Tex's performance "lacked enthusiasm" and "wasn't quite what [he] had thought it should be after making a comeback and a television shot this early." (J.A. at 1530.) Hazelton then told

Steptoe that he had spoken with the ringside officials about the fight, and they were of the opinion that the fight had been arranged. Immediately after the fight, Hazelton had Cobb and Barch submit to a surprise drug test. Barch tested positive for cocaine, while Cobb tested positive for marijuana. Hazelton imposed an indefinite suspension on both boxers as a result of the positive drug tests. Hazelton also suspended Barch for either being in a pitiful physical condition for the fight or for not giving maximum effort. Cobb was not similarly suspended for his performance.

Barch then contacted Hazelton in the summer of 1993. According to Hazelton, Barch told him that Parker had convinced Barch to "take a dive" in the Cobb fight, that Cobb and Barch had discussed how this would happen in Barch's hotel room before the fight, and that Barch and Cobb had used cocaine together after the fight in Parker's hotel room. Hazelton told Steptoe about this conversation, and indicated that Barch had repeated these allegations in a sworn statement before the FSAC. Hazelton then told Steptoe that he believed Barch and that he "thought that the information [he] received from Barch was accurate." (J.A. at 1547.) Hazelton concluded that the film "bears out everything that was said." (J.A. at 1556.) Steptoe found Hazelton to be a very credible witness.

Steptoe also interviewed Rob Russen, Rick Parker's former business partner, who had been a partner in the promotion of the September 1992 fight card. Russen told Steptoe that Cobb's comeback was a "smoke mirage," (J.A. at 1001) and that everyone in the know at the promotion knew that Barch was going into the ring with Cobb to take a dive. Russen told Steptoe that when he went to Parker's hotel room after the fight he smelled marijuana smoke and saw Barch and Cobb come out of the bathroom in a cloud of marijuana smoke. He also told Steptoe that there had been cocaine in the room, and that "they" had it. (J.A. at 998.) Steptoe interpreted Russen's statement that "they" had cocaine to refer to Cobb and Barch. Cobb, however, later testified that he was in Parker's hotel room after the fight only because he had to go there in order

demonstrate that *SI* acted with actual malice with respect to those statements.

The third, and strongest, argument Cobb makes in support of the jury's finding of actual malice is that the *SI* reporters purposefully avoided learning the truth. Cobb contends that *SI*'s avoidance of the truth was shown by *SI*'s failure to ask any of the interviewees whether Cobb participated in the fix. Cobb asserts that *SI*'s failure to contact the referee, the ringside judges, or the fight physician further supports this conclusion. The Supreme Court's decisions in *Harte-Hanks* and *Butts* guide our determination in this regard. In *Harte-Hanks*, the defendant published an article accusing plaintiff of a scheme to blackmail a political opponent. The defendant interviewed the informer (whose account of the scheme the article was based upon), the plaintiff, and five other witnesses, each of whom had allegiances to plaintiff. The plaintiff and the five other witnesses all denied the informer's allegations. There was, however, a key witness who was not interviewed. That witness had allegiances to the informer (she was the informer's older sister), and had been present at the meeting with the plaintiff in which the blackmail scheme was allegedly discussed. The court determined that the failure to investigate was likely "the product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the informer's] charge," and upheld a jury verdict in favor of the plaintiff. *Harte-Hanks*, 491 U.S. at 692.

In *Butts*, the underlying facts were somewhat similar to those of this case. The defendant's article accused plaintiff of "fixing" a football game by giving away plays, strategies, and secrets to the other team. The informer was someone who supposedly overheard the conversation between the plaintiff and the other team's head coach and took detailed notes of the conversation. The Court upheld a jury verdict in favor of the plaintiff because elementary precautions were ignored, despite the fact that the story was not "hot news." Among the investigatory shortcomings were the following: the defendant 1) failed to interview a witness who was allegedly present

(J.A. at 146.)   Certainly, this paragraph is misleading. Because the last sentence follows immediately after Barch's allegation that he and Cobb used cocaine together, it implies that Cobb tested positive for cocaine. But the positive drug test is not the statement at issue in this case. The district court held that any implication in the article that Cobb's urine sample taken immediately after the fight tested positive for cocaine, rather than marijuana, was not actionable because it was substantially true. The "sting" of the statement was that Cobb must have used an illegal drug *prior* to the match. The article does not suggest that any drug test was done after the alleged drug use in the hotel room following the fight. Moreover, *SI* printed a clarification explaining that Cobb had tested positive for marijuana, not cocaine.

The next falsehood Cobb points to is that his shoulder was injured. But the *SI* piece never states that Cobb's shoulder was, in fact, injured. Nor does it indicate that Barch said it was, in fact, injured. To the contrary, the article simply stated that when Cobb met with Barch before the fight Cobb *claimed* he was injured. Furthermore, the district court granted summary judgment with respect to any libel claim Cobb might have based on this statement because it was substantially true.

Cobb next contends that *SI*'s false representation that Barch wrote a first-person narrative included in the article was evidence of actual malice. As *SI* points out, however, the article is merely a narrative attributed to Barch and "ghost written" by a *SI* reporter. The fact that *SI* composed the narrative from notes of Barch's spoken narrative is not evidence of actual malice with respect to the statements at issue, made in the body of the article. *SI* reporters testified that ghost writing such first person accounts for athletes was standard practice. Cobb cites no authority suggesting that this practice could constitute evidence of actual malice with respect to other statements in an article. In any event, all three of these purported falsehoods are collateral to the two statements at issue here, and do not clearly and convincingly

to get paid for the fight. Steptoe found Russen extremely credible and knowledgeable regarding Parker's operation.

Next, Steptoe interviewed Tim Anderson, Cobb's originally scheduled opponent, by telephone. Anderson told Steptoe that Parker had substituted Barch for him at the weigh-in. Anderson said that Parker's purported reason for the substitution – that Anderson was demanding more money – was false, and that the real reason for the substitution was that Barch would "lay down" for Cobb.

Finally, Steptoe and *SI* reporter William Nack interviewed Barch in person. Barch told them the same story he had told Robinson over the phone, providing more details. Some portions of Barch's account, however, are notable because they arguably cast some doubt on Barch's veracity. First, Barch told them that Cobb came into his hotel room to discuss how the fight would play out. Barch said that at that meeting Cobb told Barch that his shoulder was injured. Barch told the *SI* reporters that he did not believe Cobb, but that he assured Cobb that he would not hit him in the shoulders. The *SI* investigators agreed that it did not appear from the videotape of the fight that Cobb had a shoulder injury at the time. However, the *SI* staff decided to print Barch's statement regarding the injury, concluding that they were not reporting that Cobb, in fact, had a shoulder injury, but simply that he had told Barch he had a shoulder injury. Second, Barch told the *SI* reporters that he was puzzled that his post-fight drug test had come back positive for cocaine, because he had filled his specimen bottle with tap water. The *SI* investigators acknowledged that it would be impossible for the test to come back positive if he had submitted only tap water. The *SI* journalists acknowledged that this story was "bizarre," and they decided to simply present Barch's tap water story to the readers in the article, allowing readers to draw their own conclusions. Robinson testified that the only explanation he could come up with was that Barch had added tap water to urine in an unsuccessful attempt to doctor the sample, rather than simply filling the specimen bottle entirely with tap water. The *SI* staff sought out information about

Barch's criminal history. Barch volunteered some information, including that he had been arrested for passing bad checks, had used drugs, and had once been accused of rape. *SI* later found out that Barch had recently been arrested for intent to deliver a controlled substance, a fact that Barch had not mentioned. When Robinson confronted Barch with this information over the telephone, Barch hesitated and asked if he could call back. *SI*'s in-house investigator subsequently discovered that Barch had become an informant for the Narcotics Division and was working on a case undercover. Nack and Steptoe ultimately concluded that they believed Barch, because Barch had been consistent regarding the details of the story. They also noted that Barch had incriminated himself in his statements, and that Barch did not seem to harbor any animosity toward Cobb.

Steptoe then met with Parker, who denied most of Barch's allegations. Parker did mention, however, that he had substituted Barch for Anderson because he did not want to allow Anderson to "derail [him]" by beating Cobb.[1]

Steptoe never interviewed Cobb in person, but she did repeatedly try to contact Cobb in order to hear his side of the story. Steptoe asked each person she interviewed for information on how to contact Cobb. She asked Parker to have Cobb contact her. She left messages for Cobb's handler and his Hollywood agent. She called Cobb's wife, sent faxes to Cobb's home, and called a friend of Cobb. On September 26, 1993 Cobb telephoned Steptoe. Cobb denied the allegation that the fight was fixed and told Steptoe to watch the videotape of the fight. When Steptoe offered to fly to Nashville to interview him personally, Cobb declined. Steptoe did not ask Cobb any questions concerning the drug use allegations. She testified that she was unable to, because

---

[1] Anderson had previously beaten former NFL lineman Mark Gastineau in a fight promoted by Parker. The *SI* article alleged that Parker had tried to build up the win/loss records of Cobb and Gastineau in order to secure a fight with a well-known, highly-ranked boxer, producing a large payday for the promoter and his boxer.

cooperation with the police. That Barch did not disclose his most recent arrest to *SI* did not give the journalists any additional reason to doubt what Barch had told them, given that Barch had been instructed by the police not to compromise their investigation by disclosing his arrest. Moreover, the fact that Barch was being paid for his first person account does not, in itself, support a finding of actual malice. Cobb points to the tap water urine test story as evidence that *SI* had reason to doubt Barch. The *SI* staff admitted that they found this story bizarre. But they also testified that they thought he could have meant that he added tap water to his urine sample, rather than just completely substituting tap water. If that were the case, then a positive test for cocaine would still be plausible. Further, the tap water story was tangential to the real story – which was his admission of participating in fixed matches. The *SI* reporters uncovered no particular reason to think that Barch was lying in his accounts of those activities, or in his own admissions of drug use. Although the tap water story was curious, it was not an "obvious reason" to doubt Barch's veracity or the accuracy of his reports with respect to the two statements at issue here.[3]

Second, Cobb argues that *SI* intentionally published known falsehoods, indicating actual malice. Cobb points to *SI*'s removal of a sentence clarifying that Cobb tested positive for marijuana, rather than cocaine. The final version of the article read,

> Barch does say that he and Parker had snorted cocaine until three o'clock on the morning of the fight, and that after the show he, Parker and Cobb shared a half ounce of cocaine. The Florida commission suspended both Barch and Cobb after the positive tests.

---

[3] The *SI* reporters decided to include in the article the tap water story, Barch's admission of drug use, and the positive test results in order to permit the readers to draw their own conclusions about this one peculiar aspect of Barch's account.

sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'"   466 U.S. at 511.  In making this determination, the reviewing court must consider the factual record in full.  *Harte-Hanks*, 491 U.S. at 688.  Credibility determinations made by the trier of fact are reviewed under a clearly erroneous standard, but the reviewing court must "examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect."  *Id.* (quoting *New York Times*, 376 U.S. at 285) (alterations in original).

Here, the statements in issue are 1) that Randall "Tex" Cobb was a knowing participant in the fixing of his September, 1992 boxing match with Sonny Barch, and 2) that Cobb used cocaine with Barch after the boxing match.  After a full review of the record, we conclude that there is insufficient evidence to support the jury's finding that *SI* acted with actual malice as to these statements.

Cobb argues that circumstantial evidence presented at trial established actual malice.   Cobb contends that he demonstrated actual malice in three ways:  1) with evidence that *SI* had reason to doubt Barch, and never dispelled such doubt, 2) with evidence that *SI* intentionally published known falsehoods, and 3) with evidence that *SI* purposefully avoided learning the truth.  Cobb's evidence falls far short of the clear and convincing standard on all three counts.

First, Cobb argues that the record shows that *SI* had reasons to doubt Barch.  It is certainly true that *SI* was aware of Barch's sketchy past.  But the *SI* reporters acted accordingly.  They attempted to corroborate as much of Barch's story as possible, recognizing that they would probably be unable to corroborate any one-to-one conversations (with no witnesses) between Barch and Cobb, unless Cobb admitted to the allegations.  They investigated Barch's criminal background, confronted Barch with an arrest that he had not volunteered, and discovered that he was acting as an informant in

Cobb "rushed [her] off the phone." (J.A. at 1070.) Following this phone conversation, Steptoe made efforts to contact Cobb again, to "give him another chance [to] respond to the allegations," including the drug allegations.  (J.A. at 1071.) Steptoe left voice messages for Cobb, but was unable to speak with Cobb again.

Aside from the interviews, the *SI* journalists repeatedly reviewed the videotape of the Cobb-Barch fight.  Robinson, Nack, and Steptoe each reviewed the tape and independently concluded that Cobb was fighting in a contrived fashion.  In addition, *SI* fact-checker Sally Guard reviewed the tape. Although Steptoe and Guard did not have extensive experience with the sport of boxing, Robinson and Nack did. Nack had covered dozens of fights since 1972 for various publications.  Robinson had served as *SI*'s boxing editor for nine years, and had seen hundreds of boxing matches.[2]

As Cobb notes, however, the *SI* investigation was by no means exhaustive.  *SI* never directly interviewed the referee who worked the match or the ringside judges.  Nor did *SI* ever obtain the transcript of Barch's sworn testimony before the FSAC.  Nor did *SI* ever consult a boxing expert (other than their own experienced boxing journalists) concerning Cobb's performance.  Further, the *SI* investigators never expressly and directly asked anyone other than Barch whether Cobb was a knowing participant in the sham.

### III.  Legal Analysis

*SI* challenges the jury's verdict on several grounds.  First, *SI* argues that Cobb failed to prove, by clear and convincing evidence, that *SI* acted with actual malice.  Second, *SI* argues that the district court improperly excluded evidence regarding

---

[2]In deciding to publish the article, Robinson also found it important that Cobb had tested positive for marijuana immediately after the fight. According to Robinson, Cobb's use of drugs while training for his first fight in over four years suggested that Cobb was not concerned about the fight or what would happen in the ring.  (J.A. at 1664-66.)

other fixed fights – evidence which *SI* claims provided additional corroboration for Barch's story. Third, *SI* argues that the trial court improperly instructed the jury that Cobb needed to prove the actual falsity of the statements in the article by a preponderance of the evidence, rather than by the higher standard of clear and convincing evidence. Fourth, *SI* contends that the statement regarding Cobb's cocaine use after the fight was substantially true, and thus, cannot be the basis for liability. Finally, *SI* argues that it is entitled to a new trial on liability and damages because the compensatory damage award was grossly excessive. Because we find that the record does not support a finding of actual malice we consider only *SI*'s first argument, and reverse the district court's order and judgment.

## A. Actual Malice

In *New York Times Co. v. Sullivan*, the Supreme Court announced that in a libel suit brought by a public official the plaintiff must prove, by clear and convincing evidence, that the defendant acted with "actual malice" in order to impose liability. 376 U.S. 254, 285 (1964). This rule is founded on the concept that First Amendment freedom of speech protections require a certain degree of "breathing space" in order to survive. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989). A majority of the Court later clarified that the *New York Times* standard applies with equal force to all public figures, not just public officials. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 162 (1967) (opinion of Warren, C.J., concurring); *cf. Butts*, 388 U.S. at 155 (opinion of Harlan, J.) (suggesting a lower standard for public figures who are not public officials, which would require only a showing that defendant's conduct was an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers); *see also Harte-Hanks*, 491 U.S. at 666 ("Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.").

The actual malice standard does not refer to a showing of ill will or malice in the ordinary sense. Rather, it requires that the plaintiff demonstrate that "the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Harte-Hanks*, 491 U.S. at 667 (quoting *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 56 (1988)). The fact that the defendant published the defamatory statement in order to increase profits is insufficient to prove actual malice. *Id.* Rather, a showing of actual malice requires at least a showing that the statements were made with a "reckless disregard for the truth." *Id.* A "reckless disregard for the truth" means that the defendant "must have made the false publication with a 'high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)) (alteration in original). A failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. *Id.* at 688. Instead, there must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Thus, the failure to investigate, alone, will not support a finding of actual malice, but the "purposeful avoidance of the truth" may do so. *Id.* at 692. In a case where the defendant is reporting a third party's allegations, the standard of reckless disregard may be met where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id.* at 688 (quoting *St. Amant*, 390 U.S. at 732).

The question whether there is sufficient evidence in the record to permit a finding of actual malice is a question of law. *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 510-11 (1984). The unique nature of the interest protected by the actual malice standard requires that reviewing courts conduct an independent review to determine whether that standard has been met. As the court stated in *Bose*, "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is