**Charmaine WEST and First Alternative Probation and Counseling, Inc., Plaintiffs,**

v.

**MEDIA GENERAL OPERATIONS, INC., and Media General Operations, Inc. d/b/a WDEF–TV 12, Defendants.**

No. 1:00–CV–184.

United States District Court,
E.D. Tennessee,
at Chattanooga.

March 14, 2002.

Anita B. Hardeman, Harry F. Burnette, Burnette, Dobson & Hardeman, Chattanooga, TN, for plaintiffs.

Robert E. Coopper, Jr., Samuel L. Felker, Donald L. Zachary, Alison S. Fowler, Rebecca S. Kell, Bass, Berry & Sims, Nashville, TN, for defendant.

## MEMORANDUM

EDGAR, Chief Judge.

### I.

#### *Defendant's Motion for Judgment as a Matter of Law [Court File No. 165]*

This case is now before the Court on defendant Media General's post-trial motion [Court File No. 165] for judgment as a matter of law made pursuant to FED. R. CIV. P. 50(b). In this defamation case, the jury returned a verdict in favor of plaintiff Charmaine West ("West") in the sum of $190,000, and in favor of plaintiff First Alternative Probation and Counseling, Inc.("FAPC") in the amount of $120,000. Defendant Media General contends it is entitled to a verdict as a matter of law since, says Media General, the plaintiffs failed to prove defamation.

■ In reviewing the FED. R. CIV. P. 50(b) motion, this Court is required to follow Tennessee law. A federal court sitting in diversity under 28 U.S.C. § 1332 must apply the standard for judgments as a matter of law of the state whose substantive law governs. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 818 (6th Cir.1999); *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 506 (6th Cir.1998); *Tschira v. Willingham*, 135 F.3d 1077, 1087 (6th Cir.1998); *TGC Corp. v. HTM Sports, B.V.*, 896 F.Supp. 751, 753 (E.D.Tenn.1995).

■ When deciding the Rule 50(b) motion, Tennessee law requires that this Court:

> take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence. A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn.1977); *see also Tschira*, 135 F.3d at 1087; *Grantham and Mann v. American Safety Products*, 831 F.2d 596, 602 (6th Cir.1987); *Arms v. State Farm Fire & Cas. Co.*, 731 F.2d 1245, 1248–49 (6th Cir.

1984); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn.1994).

 Media General demonstrates considerable chutzpah in even making the argument that it is entitled to a judgment as a matter of law. Suffice it to say that there was much evidence that Media General defamed the plaintiffs. Most certainly, there was enough evidence to DENY this Rule 50(b) motion. This Court has taken the strongest legitimate view of the evidence in favor of the plaintiffs, allowing all reasonable inferences in the plaintiffs' favor and discarding all countervailing evidence. Defendant is not entitled to judgment as a matter of law pursuant to Rule 50(b) on the defamation claims.

 Defendant asserts that whether a statement is capable of being understood as defamatory is initially a question of law for the Court to decide. *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn.1978). Although this is a correct statement of Tennessee law, it does not entitle the defendant to any relief under Rule 50(b). The Court concludes as a matter of law that the disputed statements published by the defendant are capable of being understood as defamatory by objectively reasonable persons who viewed the television broadcasts.

Defendant also contends that because the Court purportedly did not require the plaintiffs to more precisely identify the language from the television broadcasts that is alleged to be defamatory, the Court did not exercise its responsibility to determine whether specific statements are capable of being understood as defamatory. This argument fails. Plaintiffs did identify and prove specific defamatory statements in their complaint, in the final pretrial

order, and at trial. The Court did review the statements and determined that they were capable of being defamatory before the Court submitted the case to the jury. The defamatory statements must be considered within the context of the "Probation For Sale" television series as a whole, including both the audio and visual presentations and their combined effect. This matter is discussed in more depth *infra* with regard to the defendant's motion for new trial brought under FED. R. CIV. P. 59.

Accordingly, the defendant's Rule 50(b) motion will be **DENIED**. A separate order will enter.

## II.

### Defendant's Motion for New Trial or, in the Alternative, a Remittitur [Court File No. 167]

 Also before the Court is the defendant's motion [Court File No. 167] for a new trial under FED. R. CIV. P. 59, or, in the alternative, remittitur. Generally, the standard of review used in deciding a Rule 59 motion in diversity cases is a federal one.[1] *Conte v. General Housewares Corp.*, 215 F.3d 628, 637 (6th Cir. 2000); *Webster*, 197 F.3d at 818; *Arms*, 731 F.2d at 1248 n. 2. There are three circumstances which may warrant a new trial under Rule 59: (1) the verdict is against the clear weight of the evidence; (2) the damages award is excessive; or (3) the trial was influenced by bias, prejudice, or other unfairness to the moving party. *Conte*, 215 F.3d at 637–38; *Holmes v. City of Massillon, Ohio*, 78 F.3d 1041, 1045–46 (6th Cir.1996). When ruling on a motion for new trial claiming that the verdict is against the weight of the evidence, the

---

1. There is an exception to the general rule discussed *infra*. A federal district court sitting in diversity must apply state law standards when considering a Rule 59(a) motion for new trial based on the alleged excessive-

ness of the jury's award of compensatory damages. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 438–39, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

district court may compare the opposing proofs and weigh the evidence. While a district judge has a duty to intervene in appropriate cases, a jury's verdict should be accepted and not disturbed if it is a verdict which could reasonably have been reached. *Conte*, 215 F.3d at 637–38; *Webster*, 197 F.3d at 818; *Tobin v. Astra Pharm. Prod.*, 993 F.2d 528, 541 (6th Cir. 1993); *Porter v. Lima Memorial Hosp.*, 995 F.2d 629, 635 (6th Cir.1993); *Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1523–24 (6th Cir.1990). A jury verdict is not considered to be unreasonable simply because different inferences could have been drawn from the evidence or because other results are more reasonable. *Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir.1998); *Porter*, 995 F.2d at 635; *Woodbridge v. Dahlberg*, 954 F.2d 1231, 1234 (6th Cir.1992); *J.C. Wyckoff & Assoc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1487 (6th Cir.1991).

There is no justification for granting a new trial or a remittitur. The jury's verdicts are not against the weight of the evidence. The damage awards are not by any means excessive. The Court is not aware of any evidentiary or other ruling which was made in error.

### A. Liability For Defamation

██ Defendant argues that the Court erred by not requiring the plaintiffs to identify, prior to trial, the precise statements alleged to be defamatory. Defendant complains it was unable to prepare adequately a "targeted defense" because the plaintiffs only identified general topics rather than exact statements. Moreover, the defendant contends it was only during closing arguments to the jury at the conclusion of the trial that the plaintiffs identified the exact statements alleged to be defamatory.

This argument fails. The record shows the defendant had sufficient notice prior to

trial about the plaintiffs' specific defamation claims, and the defendant had every fair, reasonable opportunity to prepare for trial and defend itself. The plaintiffs' complaint filed on May 3, 2000, identified several alleged defamatory statements with sufficient specificity to put the defendant on fair notice as to the nature and substance of the defamation claims. The final pretrial order entered on November 8, 2001 [Court File No. 133, pp. 4–5], lists the topics and statements alleged to be defamatory.

This same subject was discussed and resolved at the final pretrial conference held on November 7, 2001. [Transcript of Final Pretrial Conference, pp. 63–70]. At the final pretrial conference, the Court heard oral argument on the defendant's motion *in limine* to compel the plaintiffs to identify each precise statement they contend is defamatory or places Charmaine West in a false light. [Court File No. 97]. The Court denied the defendant's motion *in limine* and explained that this suit involves television broadcasts which must be viewed as a whole, with all alleged defamatory statements being considered in the totality of the audio and visual presentation. The audio portion of the television broadcasts along with the photography and editing effects must be considered together in combination when determining whether statements, in the context actually published and presented to the public, are defamatory. The final pretrial order listed the defamatory topics and statements that are in dispute.

██ Defendant strives to argue its way around the final pretrial order. But the record shows that the defendant's counsel advised the Court at the final pretrial conference that the final pretrial order was sufficient with regard to specifying the defamatory statements. During the final pretrial conference, the defendant's lead

trial counsel, Donald Zachary, reviewed and discussed the final pretrial order wherein the plaintiffs listed the alleged defamatory statements. With direct reference to the listing of the alleged defamatory statements in the final pretrial order, Mr. Zachary told this Court: "If these are, if these are the elements that they're going to prove then that probably is sufficient, Your Honor." Mr. Zachary further said: "If it's limited to that, then we're happy with that." [Transcript of Final Pretrial Conference, p. 68]. The Court took Mr. Zachary at his word. Defendant cannot reasonably be heard now in a Rule 59 motion for new trial to raise a complaint about the sufficiency of the final pretrial order.

Why is it proper in the instant case for the plaintiffs to identify the defamatory statements in the form of topics in the final pretrial order rather than quoting the exact defamatory words uttered by the defendant? The answer lies in the nature of the medium that the defendant utilized to publish its defamatory statements—television. The present case is different from the usual libel suit where written words are printed in a book, newspaper or magazine. In defamation cases involving the mere publication of written statements, it is a relatively simple, straightforward task for a plaintiff to identify with absolute precision the exact words that are alleged to be defamatory. However, in cases involving television broadcasts with a stream of audio and visual components interacting with each other, the plaintiffs' burden of identifying alleged defamatory words with absolute precision and exactitude is much more complicated and poses an especially difficult problem. Common sense dictates that the Court must exercise a reasonable degree of discretion in devising a practical solution to be fair and impartial to both sides of the controversy.

In *Lasky v. American Broadcasting Companies, Inc.*, 631 F.Supp. 962 (S.D.N.Y.1986); a case cited with approval by defendant Media General, the district court correctly reasoned that television programs are divided into a number of video and audio segments. In some segments, the audio and video are of the same event such as when a person makes a remark or statement on camera. In other segments, the audio may be a "voice-over" to a different video or photograph. "It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended." *Id.* at 970. In reviewing a television broadcast for possible defamatory statements, a court and jury cannot confine their analysis to the words alone. The court and jury are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript. "It is the entirety of the program, both audio and video, that must be considered in determining whether a television program is reasonably susceptible of a defamatory meaning." *Id.; accord White v. Fraternal Order of Police*, 909 F.2d 512, 526 (D.C.Cir.1990); *Southern Air Transport v. American Broadcasting*, 877 F.2d 1010, 1015 (D.C.Cir.1989); *Corporate Training v. National Broadcasting Co.*, 868 F.Supp. 501, 507 (E.D.N.Y.1994); *Crowley v. Fox. Broadcasting Co.*, 851 F.Supp. 700–701 (D.Md.1994); *Metcalf v. KFOR–TV, Inc.*, 828 F.Supp. 1515, 1525 (W.D.Okla.1992); *Silvester v. American Broadcasting Companies, Inc.*, 650 F.Supp. 766, 770 (S.D.Fla. 1986), *aff'd*, 839 F.2d 1491 (11th Cir.1988); 50 Am.Jur.2D *Libel and Slander* § 132 (1995).

As the district court cogently explained in *Corporate Training*, 868 F.Supp. 501, television adds new, significant variables to the defamation analysis. A television director or reporter can, in many subtle ways, alter the tone and meaning of an otherwise innocuous broadcast through audio and visual editing techniques.

> With the emerging popularity of self-styled 'magazine' news programs, courts should be sensitive to the possibility that a transcript which appears relatively mild on its face may actually be, when the total mix of creative ingredients are considered, highly toxic. Indeed, a clever amalgamation of half-truths and opinion-like statements, adorned with orchestrated images and dramatic audio accompaniment, can be devastating when packaged in the powerful television medium.

*Id.* at 507; *see also Stokes v. CBS, Inc.*, 25 F.Supp.2d 992, 999 (D.Minn.1998).

It is, therefore, acceptable for West and FAPC to be permitted to identify the defamatory statements by listing generalized but specific topics. This process allows the plaintiffs a reasonable and logical means for articulating the basis for their defamation claims, taking into consideration the blending of audio and visual components in the television programs. For example, in the final pretrial order the plaintiffs say the defendant falsely charged that Charmaine West had an improper sexual "cozy" relationship with a judge and that she was Judge Holcomb's vacationing buddy. The defendant's use of the phrase "cozy" relationship has to be considered by the Court and the jury in the context of the visual images being shown on the television screen. The final pretrial order also says that the defendant falsely charged the plaintiffs with bribing the General Sessions Court, and this false charge was created through the visual image of hands counting out money in conjunction with use of the program's title, "Probation For Sale."

Under the facts and circumstances of this case, the plaintiffs did an adequate job of identifying and specifying which portions of the television broadcasts they allege are defamatory. Defendant has not suffered undue prejudice or been deprived of a fair trial. The defendant was not surprised at trial concerning the defamation claims being asserted against it. As a result of the plaintiffs' complaint, the discovery process, and the final pretrial order, the defendant received more than sufficient notice prior to trial of the specific nature and substance of the plaintiffs' defamation claims and the defendant had a fair, reasonable opportunity to defend itself at trial.

What the defendant wants is for the plaintiffs to be required to take isolated excerpts of quoted language from transcripts of the television programs, and then specify the excerpts as being the exact words upon which the defamation claims are predicated. This is neither feasible nor necessary in the present case beyond what is already contained in the final pretrial order. Although it is important, as in any defamation case, to focus on the words and language published by the defendant, this should not be the only focal point to the exclusion of other relevant facts and details. The words must be viewed in their proper context in juxtaposition to all of the audio and visual components of the television broadcasts as a whole. The defendant's defamatory words, standing alone, cannot readily be identified in isolation without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects. If words are taken completely out of the context of the audio and visual components of the television broadcasts as a whole, then it would not constitute a satisfactorily accurate, effective method for identifying televised state-

ments and visual images which are alleged to have a combined defamatory meaning.

In their response to the motion for new trial, the plaintiffs aptly describe the defendant's strategy as "divide and conquer." Defendant wants the Court and jury to review each alleged defamatory statement in isolation. By isolating or segregating the words and phrases in each individual statement, the defendant seeks to minimize and dilute their overall false, defamatory effect and meaning. However, the proper standard is for the jury and this Court to consider the combined effect and meaning of the alleged defamatory statements in the context of the television program as a whole.

During trial, the plaintiffs did raise the topic of whether the defendant published a defamatory statement that probationers would sleep in classes operated by FAPC. This particular matter was not listed by the plaintiffs in the pleadings and final pretrial order. The addition of this topic at trial directly resulted from the fact that the defendant did not provide the videotape of the complete James Clary ("Clary") interview to the plaintiffs' counsel until a mere five days prior to trial which was after the final pretrial order had been drafted by counsel and entered by the Court. It was only a few days prior to the beginning of trial that plaintiffs' counsel was able to review the entire interview of Clary, including out takes and raw videotape footage not broadcast by the defendant. On November 9, 2001, plaintiffs filed a pretrial notice setting forth additional disputed facts that plaintiffs' counsel had been able to glean from a quick review of the videotapes which were produced very late by the defendant. [Court File No. 142]. The following disputed factual issue was listed by the plaintiffs: "3. James Clary never saw anyone go to sleep at APC. (Clary interview video)." Plaintiffs thereby put the defendant on notice that the plaintiffs intended to raise a claim at trial about the Clary interview and the "sleeping in class" issue.

In light of the defendant's failure to timely deliver the complete videotape of the Clary interview to plaintiff's counsel before the final pretrial conference, the Court determined that it was in the best interests of justice to allow the plaintiffs to pursue the "sleeping in class" issue at trial. Defendant did not suffer any actual prejudice. Defendant and its counsel had ready access to the complete Clary interview videotape at all times. Defendant cannot plausibly claim actual prejudice or unfair surprise due to the "sleeping in class" issue being raised at trial. The evidence at trial showed that the defendant selectively and deliberately edited Clary's interview to delete a statement by Clary that he had not observed any probationers sleeping in the FAPC classes. Defendant had a full opportunity at trial to present its proof, explain its conduct, and defend against this defamatory statement.

Defendant also asserts the plaintiffs raised a new claim for the first time at trial that the defendant made a false, defamatory statement to the effect that FAPC had an "exclusive contract" with the Hamilton County General Sessions Court to provide probation services. Defendant complains that the final pretrial order did not precisely list this specific topic. This argument fails, however, because the statement about whether FAPC had an exclusive contract does fall within the ambit and parameters of the defamatory items listed in the final pretrial order. In the final pretrial order, the plaintiffs claimed defamatory statements were made about West and FAPC operating an illegal, unethical business based in large part on an alleged unusual, improper relationship between West/FAPC and the state judges. One thrust of the television program was

that West and FAPC exercised special influence over the state judges. The defendant's statement about FAPC having an "exclusive contract" is part and parcel of the overall, total defamatory message being conveyed by the defendant to the effect that: (1) FAPC and West were operating an illegal, unethical business; and (2) West and FAPC had an improper relationship with and improper influence over the state judges.

■ The "exclusive contract" issue did not come as any surprise to the defendant at trial. It was explored by the parties during discovery and explicitly raised by the plaintiffs prior to trial.[2] Defendant did not suffer any prejudice or unfair surprise when the matter was again raised at trial. Defendant had a full and fair opportunity to defend itself against the plaintiffs' claim that this is a defamatory statement. The jury could reasonably find from the evidence that the statement was false in that FAPC and West did not have an exclusive contract. The General Sessions Judges were not contractually obligated to send all probation matters exclusively to FAPC. The statement is capable of having a defamatory meaning in the context of the television program as a whole. An objectively reasonable person viewing the television broadcast could interpret and understand the false statement about an exclusive contract to mean that West and FAPC were somehow operating an illegal, unethical business, and they had a very unusual, improper relationship with the state judges and/or special influence with the state judges.

Defendant next says that the plaintiffs' failure to specify what statements they alleged to be defamatory impeded the Court from fulfilling its duty to determine as a matter of law whether the statements are capable of being defamatory. This is the same argument raised by the defendant in its Rule 50(b) motion for judgment as a matter of law discussed *supra*. This argument lacks merit. The plaintiffs did identify specific defamatory statements in their complaint and the final pretrial order. Plaintiffs presented proof at trial that the statements were defamatory. The Court heard the proof and fulfilled its duty of determining as a matter of law whether the statements are capable of being defamatory when they are considered within the context of the combined audio and visual portions of the television program taken as a whole.

### B. Verdict Form

■ It is argued by the defendant that the Court erred in not requiring the jury to complete either a special verdict form or interrogatories as authorized by FED. R. CIV. P. 49. Defendant contends that a special verdict form or a general verdict form with interrogatories is necessary where there are allegations of multiple defamatory statements citing *Tavoulareas v. Washington Post Co.*, 817 F.2d 762, 808–09 (D.C.Cir.1987) (Ginsburg, J., concurring). Defendant says that use of a general verdict form makes it impossible to discern the exact statements which the jury found to be false, defamatory, and made with actual malice.

2. See Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment, Court File No. 109, p. 1, wherein plaintiffs disputed that FAPC had an exclusive contract with the General Sessions Court. This response was filed on November 4, 2001, prior to trial. The trial commenced on November 13, 2001. Moreover, on November 9, 2001, plaintiffs filed a pretrial notice of additional disputed facts recently discovered from the late-produced videotapes [Court File No. 142] again raising the issue that FAPC did not have an exclusive contract.

The Court rejects this argument for the following reasons. *Tavoulareas* was a libel action against a newspaper for words published in a printed newspaper article, and it did not involve claims of defamation based on a television program. In her concurring opinion in *Tavoulareas*, Judge Ginsburg observes and suggests in *dicta* that district courts should consider using either special verdict forms or general verdict forms accompanied by interrogatories pursuant to Rule 49 in defamation cases to assist and guide the jury in its deliberations. Judge Ginsberg said she believes this may be a "useful check against jury misconstruction or misapplication of a standard as uncommon as actual malice." *Id.* at 808. *Tavoulareas* does not stand for the proposition it is mandatory that district courts must use special verdict forms or general verdict forms accompanied by interrogatories in defamation trials involving multiple defamatory statements.

Prior to trial, defendant Media General submitted a set of proposed jury instructions which included a verdict form for the defamation claims. [Court File No. 156]. The defendant's requested verdict form is so confusing, convoluted, poorly organized, and deficient that the Court chose not to use it. The defendant's verdict form would have asked the jury to list in a group the various statements it found to be defamatory thus making it possible for the jury to lump multiple defamatory statements together. The defendant's requested verdict form goes on to propose that the jury be asked a series of questions about the multiple defamatory statements as a group, including a question about whether the jury found that the various defamatory statements were made with actual malice. In short, the defendant's proposed verdict form would not have effectively addressed and resolved the issue now being raised by the defendant in its Rule 59 motion for new trial. The defendant's proposed verdict form was not designed or structured to ask an individual set of questions about each separate defamatory statement. The defendant's requested verdict form would have only created confusion for the jury.

Taking the defendant's argument to its logical conclusion, the defendant now insists there should be a very complex verdict form where the jury is required go through a series of interrogatories or special verdicts in the following basic sequence. First, the jury would have to specify with laser-like precision each exact statement and the precise words they find to be false from the combined audio and visual effects of the television broadcasts. Second, the jury would have to make a separate finding as to each individual false statement whether that statement is defamatory. Third, the jury would also have to make a separate finding as to each individual defamatory statement whether the plaintiffs have proved by clear and convincing evidence that the defamatory statement was made by the defendant with actual malice.

The proposed verdict form submitted by the defendant at trial did not clearly request the Court to create and use such a special verdict form or interrogatories which would break down each individual defamatory statement into this series of questions. Instead, the defendant at trial requested a verdict form that lumped any and all defamatory statements into a group, and this was not an improvement over the jury verdict form devised and used by the Court.

 This Court has broad discretion under FED.R.CIV.P. 49 in deciding whether to use a general verdict form, a general verdict form accompanied by interrogatories, or a special verdict form. *Workman v. Frito–Lay, Inc.,* 165 F.3d 460, 465 (6th Cir.1999); *Bills v. Aseltine,* 52 F.3d 596, 605 (6th Cir.1995); *Portage II,* 899 F.2d at

1520; *Jarrett v. Epperly*, 896 F.2d 1013, 1020–21 (6th Cir.1990); 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D §§ 2505, 2511, 2512 (2d ed. 1995) ("Wright & Miller"). Most federal jury trials are resolved by a general verdict. *Portage II*, 899 F.2d at 1519; 9A Wright & Miller § 2501. In this defamation case, the Court properly exercised its discretion to have the jury consider the plaintiffs' defamation claims in the context of the television broadcast as a whole. The Court did not err in utilizing a general verdict form and the jury's verdict is supported by the great weight of the evidence.

Defendant contends that without the benefit of a special verdict form or interrogatories under Rule 49, it is impossible to now review the jury's verdict post-trial to determine whether the jury fulfilled its duty to make findings of fact that particular statements were false, defamatory, and made with actual malice. It is argued that this Court, as a matter of law, should have ruled at trial that all of the statements alleged by the plaintiffs to be defamatory would not be submitted to the jury because: (1) the statements were not false; (2) the statements were not capable of being defamatory; and (3) there was insufficient evidence to support a finding that the defendant made any statements with actual malice. Taking this premise one step further, defendant asserts that if even one alleged defamatory statement was erroneously submitted to the jury, then there must be a new trial on the entire defamation case because the jury returned general verdicts in favor of the plaintiffs citing *Avins v. White*, 627 F.2d 637, 646 (3rd Cir.1980), and *Doherty v. American Motors Corp.*, 728 F.2d 334, 344 (6th Cir. 1984).

Defendant seeks to apply the principle that a general jury verdict usually will be vacated if one of several claims is errone-ously submitted to the jury and the reviewing court cannot determine whether the general verdict is based, in whole or in part, on the erroneously submitted claim. The rationale is that it is impossible to know for certain that the invalid claim was not the sole basis for the general verdict. *See Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *United New York & New Jersey Sandy Hook Pilots Ass'n v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 3 L.Ed.2d 541 (1959); *Davis v. Rennie*, 264 F.3d 86, 105 (1st Cir.2001); *Levinsky's v. Wal–Mart Stores, Inc.*, 127 F.3d 122, 134–36 (1st Cir.1997); *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 468 (1st Cir.1996); *Anixter v. Home–Stake Production*, 77 F.3d 1215, 1229–31 (10th Cir.1996); *Brandenburg v. Cureton*, 882 F.2d 211, 214 (6th Cir.1989); *Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1000–1001 (3rd Cir.1988); *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 971 (2nd Cir.1987); *Bone v. Refco, Inc.*, 774 F.2d 235, 242–43 (8th Cir.1985); *Doherty*, 728 F.2d at 344; *Ely v. Blevins*, 706 F.2d 479, 480 (4th Cir.1983).

This principle is not applicable here because this Court has determined that all of the statements in dispute which form the basis for the plaintiffs' defamation claims were properly submitted to the jury. There is sufficient evidence in the record from which an objectively reasonable jury could find that each and every one of the statements, when considered in the context of the television programs as a whole, are false, defamatory, and made by the defendant with actual malice. The defendant's reliance on *Avins*, 627 F.2d 637, is misplaced. The principle set forth in *Avins* governing the validity of general jury verdicts only applies if a defective or invalid legal claim is erroneously submitted to the jury. That has not occurred in the instant case. This Court has not allowed any

invalid defamation claims to be erroneously submitted to the jury. The general verdict rendered by the jury is proper and will not be vacated.

Even if we assume *arguendo* that an alleged defamatory statement was erroneously submitted to the jury, this does not necessarily result in the jury's entire verdict being set aside and a new trial granted. This Court's diversity jurisdiction has been invoked under 28 U.S.C. § 1332 and Tennessee substantive law applies. A federal court sitting in diversity is required to construe a general verdict in the same manner that a state court would construe it, according to state law. *Fletcher v. Poole Truck Line, Inc.*, 857 F.2d 1474 (Table, text at 1988 WL 93306, at *4 (6th Cir. Sept.9, 1988)); *Adkins v. Ford Motor Co.*, 446 F.2d 1105, 1108 (6th Cir.1971).

TENN. CODE ANN. § 20–9–502 provides: "Verdict applied to good count.—If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts." TENN. CODE ANN. § 20–9–503 provides: "Scope of general verdict.— A general verdict, although it may not in terms answer every issue joined, is nevertheless held to embrace every issue, unless exception is taken at the term at which the verdict is rendered." These two statutes are read in *pari materia. Cf. Wilson v. Tranbarger*, 218 Tenn. 208, 402 S.W.2d 449 (1965).

Tennessee courts hold that a jury's general verdict will not be set aside if there is sufficient evidence to support the general verdict on one particular claim or theory of liability and the jury has been given correct instructions on that claim. Tennessee adheres to the rule that where multiple theories of liability are submitted to the jury, and there is evidence to support one or more, but not all, of the theories, a general verdict should be construed to be attributable to the theory or theories supported by sufficient evidence and submitted to the jury free from error. *McAbee v. The Overhead Door Corp.*, 875 F.2d 865 (Table, text at 1989 WL 40145) (6th Cir. April 10, 1989); *Fletcher*, 1988 WL 93306, at *4; *Watts v. Mack Trucks, Inc.*, 491 F.2d 601, 602–603 (6th Cir.1974); *Adkins*, 446 F.2d at 1108; *Tracy v. Finn Equipment Co.*, 290 F.2d 498 (6th Cir.1961); *Tutton v. Patterson*, 714 S.W.2d 268, 271 (Tenn.1986); *Alex v. Armstrong*, 215 Tenn. 276, 385 S.W.2d 110, 115 (1964); *Valentine v. Conchemco, Inc.*, 588 S.W.2d 871, 877 (Tenn.App.1979).

Consequently, if an alleged defamatory statement was erroneously submitted to the jury in this case, it was at most harmless error and does not warrant granting a new trial under Rule 59. The harmless error rule applies to motions for new trial. FED. R. CIV. P. 61. There is more than sufficient evidence in the record to sustain the plaintiffs' claims that the defendant made numerous false and defamatory statements with actual malice. Under Tennessee law, the erroneous submission of a defamatory statement for the jury's consideration does not vitiate the general verdicts rendered by the jury with regard to the valid defamation claims.

## C. Evidentiary Rulings

Defendant asserts it is entitled to a new trial based on various evidentiary rulings made at trial which are alleged to be erroneous. [Court File No. 167, pp. 5–10]. None of these arguments have any merit. Defendant merely seeks to rehash matters previously presented and ruled on. The Court has already stated the reasons for its evidentiary rulings on the record during the final pretrial conference and at the trial. The Court is satisfied that its evidentiary rulings are correct and have not caused the defendant to suffer any actual prejudice that would justify granting a

new trial under Rule 59. The motion for new trial based on evidentiary rulings will be **DENIED**.

There is one issue that needs clarification. Defendant says the Court erred in not excluding Faith Logan ("Logan") as a witness. More precisely, the defendant contends it was prejudiced by (1) the plaintiffs' alleged failure to timely disclose Logan as a person who had relevant knowledge of the facts, and (2) the Court's decision at the final pretrial conference not to allow the defendant to take Logan's discovery deposition on the eve of trial after the deadline for discovery had expired.

On about December 19, 2000, the plaintiffs mailed their initial disclosure statement to the defendant pursuant to FED. R. CIV. P. 26(a). Plaintiffs did not list Logan's name in the Rule 26(a) initial disclosure as a person likely to have discoverable information that the plaintiffs may use to support their claims. Defendant submitted its first set of interrogatories which were answered by the plaintiffs on February 6, 2001. In their answers to interrogatories, the plaintiffs did not list or identify Logan as a witness.

Counsel for plaintiffs West and FAPC knew about the existence of Logan at least by February 15, 2000. The plaintiffs' counsel here also represented Logan in a separate employment discrimination complaint filed by Logan against WDEF–TV 12 on February 15, 2000.[3] Defendant alleges *"Arguably* as of February, 2000, Plaintiffs' counsel knew of Ms. Logan's relationship with News 12 and the extent of her knowledge in connection with this lawsuit." (Emphasis supplied). [Court File No. 167, p. 8].

Plaintiffs' counsel state that while they knew of Logan's existence and Logan's employment relationship with WDEF–TV 12 in February 2000, plaintiffs' counsel are adamant that they did not know about any information Logan had with regard to the West and FAPC lawsuit. In February 2000, Logan did not volunteer any information to the plaintiffs' attorneys concerning the West and FAPC case. Plaintiffs' counsel state they first learned of Logan's knowledge about the West/FAPC litigation in the Fall of 2001. [Court File No. 174, p. 5]. This explains why plaintiffs' counsel did not identify Logan as a witness in the Rule 26(a) initial disclosure and answers to the defendant's first set of interrogatories in February 2000. Defendant does not offer any proof to refute this version of events as stated by plaintiffs' counsel. When the defendant alleges that plaintiffs' counsel "arguably" had knowledge in February 2000 about Logan's information regarding the West/FAPC suit, this is mere conjecture and speculation by the defendant. The Court has no reason to doubt the veracity of plaintiffs' counsel on this point.

On August 10, 2001, plaintiffs filed a final witness list and named Logan as a witness. [Court File No. 60]. Plaintiffs also placed Logan's name on their amended witness list filed on September 6, 2001. [Court File No. 72]. Defendant was certainly familiar with Logan and knew that Logan was a disgruntled former employee who had worked as a secretary for News Director Goldberg at the WDEF–TV station when the "Probation For Sale" television program was created and broadcast in 1999. Despite the fact that the Court extended the deadline for completing discovery [Court File No. 76], the defendant deliberately chose not to take Logan's discovery deposition. Defendant had a full and fair opportunity to depose Logan prior to trial in August—October 2001, but it failed to do so.

---

**3.** Logan was employed from October 20, 1998, to July 1, 2000, as a secretary for WDEF–TV News Director David Goldberg. [Court File No. 121, p. 2 n. 1].

The record shows that the first time the defendant ever raised an issue to the Court about taking Logan's discovery deposition was at the final pretrial conference held on November 7, 2001. On October 11, 2001, the defendant made its motion for summary judgment. [Court File No. 80]. In response to the motion, the plaintiffs submitted Logan's affidavit on October 31, 2001. [Court File No. 96]. On November 6, 2001, one day prior to the final pretrial conference, the defendant made a motion to strike portions of Logan's affidavit arguing that some of Logan's statements were not competent evidence and should not be taken into consideration by the Court under FED. R. CIV. P. 56. In its motion to strike Logan's affidavit, the defendant did not raise any contention that it had been deprived of a fair opportunity to take Logan's discovery deposition.

On November 7, 2001, the plaintiffs' submitted the revised, second affidavit of Logan. [Court File No. 129]. During the final pretrial conference on November 7, 2001, the Court heard oral argument on the defendant's motion to strike Logan's affidavit. [Transcript of Final Pretrial Conference, pp. 23–38]. The defendant's counsel stated that after receiving Logan's first affidavit, he made a request to plaintiffs' counsel to depose Logan, but plaintiffs' counsel would not agree to the discovery deposition. The defendant's counsel asked the Court to permit the taking of Logan's discovery deposition. The Court denied the defendant's request for the following reasons: (1) Logan had been listed as a witness by the plaintiffs beginning in August 2001; (2) the defendant had already had plenty of time to take discovery from Logan but failed to do so; (3) the request was not timely since it was made at the final pretrial conference a few days prior to trial; and (4) the plaintiffs' counsel were going to be extremely busy reviewing numerous videotapes that the defendant only belatedly produced at the final pretrial conference. As a result of the defendant's failure to produce the videotapes until the final pretrial conference, plaintiffs' counsel were compelled to expend an extraordinary amount of time and resources to hurriedly review the videotapes and revise their planned presentation of proof in the few remaining days immediately prior to trial. It would have been a grossly unfair imposition on the plaintiffs' counsel to force them to attend and participate in Logan's discovery deposition during the short time period after November 7, 2001, when the plaintiffs' counsel were scrambling to evaluate the deluge of last-minute videotapes and assimilate or mesh this new proof into their trial presentation.

Moreover, Logan's second affidavit contains a relatively detailed statement of facts revealing what her anticipated testimony would be at trial. Defendant has not shown that the Court's decision to deny the request to take Logan's discovery deposition caused the defendant to suffer any actual prejudice or surprise. The Court rejects the defendant's conclusory argument that it was deprived of an opportunity to prepare a meaningful cross-examination of Logan. It was the defendant's own conduct—failure to depose Logan during the pretrial discovery period and failure to timely produce numerous videotapes to plaintiffs' counsel until the final pretrial conference—that led to the defendant being unable to depose Logan at the last minute on the eve of trial. Defendant has no one to blame but itself.

### D. Damages

Defendant moves for a new trial on the issue of damages contending that the evidence at trial does not support the jury's verdict. The motion will be **DENIED**.

A trial judge in the federal system has discretion to grant a new trial on

damages pursuant to Rule 59 if the verdict is against the clear weight of the evidence. In this case where the Court's diversity jurisdiction is invoked under 28 U.S.C. § 1332 and the defendant's liability is based on Tennessee law, the substantive assessment of whether the damages are excessive and the evidence supports the damages awarded by the jury is governed by Tennessee law. *See Medcom Holding Co. v. Baxter Travenol Laboratories,* 106 F.3d 1388, 1397 (7th Cir.1997). Federal district judges in diversity cases are required to apply the "damage-control standard" supplied by state law. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 438–39, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Konkel v. Bob Evans Farms, Inc.,* 165 F.3d 275, 280 (4th Cir.), *cert. denied,* 528 U.S. 877, 120 S.Ct. 184, 145 L.Ed.2d 155 (1999); *Tatum v. Land,* 107 F.3d 871 (Table, text at 1997 WL 85144, at *3 n. 8 (6th Cir. Feb.26, 1997)); *Bivens v. Black,* 35 F.Supp.2d 607, 609–11 (E.D.Tenn.1999). *Gasperini* authorizes federal trial judges sitting in diversity cases to use the same degree of control over the size of jury verdicts on damages as is granted to state trial judges under the governing state substantive law. *Bivens,* 35 F.Supp.2d at 610.

Under Tennessee law, the trial judge exercises the function of a "thirteenth juror" by independently weighing the evidence and determining whether the evidence preponderates in favor of or against the jury's verdict. *Bivens,* 35 F.Supp.2d at 610–11; *Turner v. Jordan,* 957 S.W.2d 815, 823 (Tenn.1997); *Shivers v. Ramsey,* 937 S.W.2d 945, 947 (Tenn. App.1996). Although the amount of damages is primarily an issue for the jury to decide, trial judges in Tennessee are given considerable discretion in ordering new trials if they determine that the verdict is against the weight of the evidence or if the decision not to order a new trial would result in a miscarriage of justice. *Bivens,* 35 F.Supp.2d at 610–11.

In this case, the verdicts on damages are supported by the evidence. The amount of damages falls within a reasonable range of compensatory damages that an unbiased, objectively reasonable jury could award based on the credible evidence. The Court is not persuaded that there is any good reason to disturb the verdicts on damages.

The jury awarded compensatory damages to West in the following amounts on her defamation claim: $50,000 for injury to reputation; $100,000 for past economic loss; $10,000 for future economic loss; and $30,000 for emotional distress. [Court File No. 159]. The jury also awarded compensatory damages to FAPC in the amount of $120,000 for past economic loss. [Court File No. 159].

Defendant contends the damages are excessive and against the weight of the evidence. Defendant raises several arguments challenging the jury's verdict. First, defendant argues that no methodology introduced at trial, including the methodology of the plaintiffs' expert witness, Dr. Macomber, supports the jury's decision to award $100,000 to West for past economic loss and also award $120,000 to FAPC for past economic loss. It is asserted that West's past economic loss is completely subsumed within the damages awarded to FAPC. Defendant says that even if the jury determined that West should recover $100,000 for past economic loss, in order to avoid "double-counting," the jury should have made its damage award for past economic loss solely to FAPC. This "double-counting" theory is predicated on the premise that West is the owner of FAPC and the $100,000 in damages awarded to her for past economic loss constitutes lost wages that West would have received from FAPC.

The defendant's second argument is that in calculating compensatory damages for

past economic loss to FAPC, the jury did not properly take into consideration and make allowance for FAPC's business operating expenses or the fact that the number of FAPC's new clients had begun to decrease in August 1999, before the broadcast of the defendant's television series "Probation For Sale" in November 1999.

For the reasons expressed by the plaintiffs in their response [Court File No. 174, pp. 15–16], the defendant's arguments attacking the jury verdicts on the amount of damages lack merit. The damages awarded to West and FAPC for past economic loss are reasonable and supported by the evidence. The methodology utilized by Dr. Macomber in calculating damages was acceptable and the jury had every right to rely on Dr. Macomber's expert testimony. Defendant asserts that the verdicts are inconsistent with Dr. Macomber's own analysis and report. However, the jury is free to accept or reject Dr. Macomber's methodology, in whole or in part. The real question to be resolved is not whether the jury's verdicts are completely consistent in every respect with Dr. Macomber's methodology but, instead, whether the verdicts are reasonable based on the evidence as a whole.

The methodology used by Dr. Macomber showed a past economic loss to West in the amount of $97,981 only up through November 13, 2001. It was based upon the fact that West was earning $4,919.07 per month. Because the jury did not render its verdict until November 29, 2001, the jury reasonably could have found that West suffered an additional sixteen days of past economic loss during the period of time from November 14, 2001, through November 29, 2001. If Dr. Macomber's calculation of damages for West's past economic loss is updated and revised through the

end of the trial when the jury returned its verdict on November 29, 2001, the jury could reasonably find that West suffered approximately $2,500 in additional lost wages and employment benefits. When this $2,500 figure (representing past economic loss for November 14–29, 2001) is added to the other damages calculated by Dr. Macomber up through November 13, 2001 ($97,981), the total damages for past economic loss to West slightly exceeds the jury's verdict of $100,000 in favor of West. The jury's verdict is reasonable and justified based on the evidence.

■ There is no "double-counting" problem with regard to the award of past economic damages as claimed by the defendant. Moreover, it is not obvious from the verdict that the jury disregarded and failed to consider or allow for FAPC's business expenses. Defendant conveniently ignores the fact that FAPC's main business expense was West's salary and employee benefits. When the jury awards $100,000 to West for past economic loss, this $100,000 represents an adjustment or reduction in the award to FAPC to account for said business expense to FAPC.

The jury could reasonably find that after the defendant's defamatory television programs were broadcast beginning in November 1999, FAPC suffered a loss of approximately $10,000 per month in gross income, and the monthly losses remained at this same level for 24 months, up through the trial in the late November 2001.[4] Using simple arithmetic, the jury could find that multiplying $10,000 per month times 24 months equals $240,000 in total lost gross income to FAPC. To determine the correct amount of damages FAPC is entitled to recover for past economic loss, FAPC's regular business ex-

---

4. Trial Transcript Vol. VI, Testimony of Defendant's Expert, David Wood, pp. 1378–80 and 1393–94.

penses, including West's salary, should be deducted from the $240,000 in lost gross income. One acceptable way for the jury to make this calculation is to award $100,000 in lost wages to West and then make a corresponding deduction of the same $100,000 from the damages award to FAPC which has the effect of allowing for the business expense of West's wages.

The figure of $240,000 in lost gross income to FAPC is sufficient to explain and account for the verdict awarding West $100,000 in past economic loss (lost wages and benefits), in conjunction with the verdict awarding FAPC $120,000. By only awarding $120,000 to FAPC, the jury made an adjustment to correctly allow for or deduct FAPC's business expenses and to avoid the double-counting problem. One of FAPC's main business expenses was West's salary. The jury reasonably could have deducted $100,000 from FAPC's gross lost income as constituting a business expense (West's salary) and awarded this same $100,000 to West for her past economic loss. In other words, the jury could allow for FAPC's business expense by awarding $100,000 in lost wages to West. The $100,000 awarded to West is tantamount to deducting $100,000 in business expenses from the award to FAPC. This does not result in impermissible "double-counting" as alleged by the defendant.

For the sake of discussion, there would be double counting if the jury were to award the same $100,000 in past economic loss to both West and FAPC. For example, if the jury awarded $220,000 to FAPC and also awarded an additional $100,000 to West for her past economic loss, then it could be plausibly argued, based on the evidence, that there might be impermissible double counting or double recovery. But that has not occurred here.

In its reply brief, the defendant argues that Dr. Macomber's report says West's damages are subsumed within the damages to FAPC. Defendant goes on to contend: "Thus, even if the jury concluded that West was entitled to $100,000 for past economic loss, in keeping with Dr. Macomber's analysis, and in order to avoid double counting, the jury should have given an award of $200,000 to APC and nothing to West." [Court File No. 178, p. 22]. The Court flatly rejects this argument. As a practical matter, it makes absolutely no difference whether the jury decides to award $220,000 to FAPC and nothing to West, or instead chooses to award $120,000 to FAPC and $100,000 to West for past economic loss. The end result is the same. In either scenario, the jury would be adjusting the verdict to avoid double counting by making allowance for the fact that the payment of $100,000 in lost wages to West in effect constitutes a business expense to FAPC. By deducting $100,000 from the damage award to FAPC and awarding the same $100,000 to West, the jury did recognize and comply with the principle that West and FAPC are not entitled to a double recovery for West's $100,000 in lost wages. Accordingly, the defendant is not entitled to a new trial on the ground of purported "double counting" of damages for past economic loss and the ground of failure to allow for deduction of FAPC's business expenses.

### E. Motion for Remittitur of Damages

In the alternative to its motion for new trial on damages, the defendant moves for remittitur of damages. The Sixth Circuit has said that the standard of review for remittitur motions is similar to Rule 59 motions for new trial. Defendant urges this Court to follow the standard of review applicable to cases involving federal substantive law. Generally, a motion seeking remittitur of a damages award should be granted by a federal district court only if the jury's award clearly exceeds the

·amount which, based on the evidence in the case, was the maximum that a jury could reasonably find. *Slayton v. Ohio Dept. of Youth Services,* 206 F.3d 669, 679 (6th Cir.2000); *Strickland,* 142 F.3d at 357; *Bickel v. Korean Air Lines Co., Ltd.,* 96 F.3d 151, 156 (6th Cir.1996); *Roush v. KFC National Management Co.,* 10 F.3d 392, 397 (6th Cir.1993). In cases governed by federal substantive law, the Court must let the damages award stand undisturbed unless the award is beyond the range reasonably supportable by the proof, or so excessive as to shock the conscience, or the result of a mistake. *Slayton,* 206 F.3d at 679; *Bickel,* 96 F.3d at 156; *Leila Hosp. & Health Ctr. v. Xonics Medical Sys.,* 948 F.2d 271, 278 (6th Cir.1991).

■ Applying this federal standard as requested by the defendant, the Court concludes that the motion for remittitur must be **DENIED**. The compensatory damages awarded by the jury in its verdicts do not clearly exceed the maximum amount of damages that an objectively reasonable jury could award based on the evidence in this case. The jury's award of damages is not beyond the range supportable by the evidence, it is so not excessive that it shocks the conscience, and it is not the result of a mistake by the jury.

■ This does not end our analysis. This Court, exercising its diversity jurisdiction, is required to follow Tennessee substantive law concerning remittitur. *See Gasperini,* 518 U.S. 415, 116 S.Ct. 2211; *Tatum,* 1997 WL 85144, at *3 n. 8. The Tennessee standard of review for trial courts in considering remittitur motions is essentially the same as the federal standard enunciated by the Sixth Circuit. *Id.; Thrailkill v. Patterson,* 879 S.W.2d 836, 840–41 (Tenn.1994); *Bates v. Jackson,* 639 S.W.2d 925 (Tenn.1982); *Foster v. Amcon Intern., Inc.,* 621 S.W.2d 142 (Tenn.1981); *Smith v. Shelton,* 569 S.W.2d 421, 427 (Tenn.1978) (It is the exclusive province of

the jury to assess damages within the range of reasonableness established by the credible proof. Trial judges are without authority to reduce or increase jury verdicts that fall between the upper and lower limits of that range.). Under Tennessee law, the trial judge acts as a "thirteenth juror" in reviewing the amount of the damages award. If the trial judge approves of the jury's verdict on liability but is of the opinion that the amount of the damages award is excessive and should be reduced, the trial judge may suggest an adjustment to the verdict by means of remittitur. If the prevailing party is not willing to consent to the remittitur, the trial judge can order a new trial. *Turner v. Jordan,* 957 S.W.2d 815, 823 (Tenn.1997); *Thrailkill,* 879 S.W.2d at 840; *Grandstaff v. Hawks,* 36 S.W.3d 482, 499 (Tenn.App.2000); Tenn. Code Ann. § 20–10–102(a).

The defendant's motion for remittitur here will be **DENIED**. The Court finds that amount of damages awarded to the plaintiffs is fair and objectively reasonable based on the evidence. The amount of damages awarded by the jury does not clearly exceed the maximum amount that an unbiased, objective jury could reasonably find.

## III.

### *Actual Malice: Standard of Review*

Defendant argues that the usual standards of review for motions brought under Rule 50(b) and Rule 59 should not be applied with regard to the element of actual malice. Defendant cites *Cobb v. Time, Inc.,* 278 F.3d 629, 636–38 (6th Cir.2002), for the proposition that the district court is required to review the record *de novo* and make an independent judicial determination whether any alleged defamatory statements were made by the defendant with actual malice. [Court File No. 192].

The defendant's reliance on *Cobb* is misplaced. Defendant misreads and misinterprets *Cobb* which is predicated on a separate constitutional rule of appellate review enunciated by the Supreme Court in *Harte–Hanks, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); and *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). This Court rejects the defendant's invitation to follow and apply a standard of appellate review when deciding the post-trial motions filed by the defendant pursuant to Rule 50(b) and Rule 59.

■ In defamation cases involving public figures, the question whether the evidence is sufficient to support a finding of actual malice is a question of law. *Harte–Hanks*, 491 U.S. at 685, 109 S.Ct. 2678; *Bose*, 466 U.S. at 510–11, 104 S.Ct. 1949. The Supreme Court in *Bose* explains that the requirement of independent appellate review reiterated in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), is a rule of federal constitutional law. This rule reflects a "deeply held conviction" that appellate judges must exercise independent review in order to preserve the liberties established by the First Amendment to the United States Constitution. The question whether the evidence in a defamation case is of the "convincing clarity required to strip the utterance of First Amendment protection is not merely an issue for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose*, 466 U.S. at 511, 104 S.Ct. 1949.

*Bose* holds that the clearly-erroneous standard of FED. R. CIV. P. 52(a) does not prescribe the proper standard for appel-

late review of a determination of actual malice in cases governed by *New York Times v. Sullivan.* Instead of applying the Rule 52(a) clearly erroneous standard to findings of fact that there is actual malice, appellate judges are required to exercise independent judgment and determine whether the record of evidence from the district court establishes actual malice with "convincing clarity." *Bose*, 466 U.S. at 514, 104 S.Ct. 1949; *see also Harte–Hanks*, 491 U.S. at 659, 109 S.Ct. 2678. In other words, *Bose* mandates independent appellate review of issues of "constitutional fact." *Bose*, 466 U.S. at 508 n. 27, 104 S.Ct. 1949. The Sixth Circuit's opinion in *Cobb*, 278 F.3d 629, merely applies the *Bose* rule for independent appellate review on questions of actual malice in defamation cases at the appellate level.

■ This is only a standard of appellate review. *See, e.g., Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186 (9th Cir.2001); *Campbell v. Citizens For Honest Government, Inc.*, 255 F.3d 560, 570 (8th Cir.2001); *Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249, 1251–52 (9th Cir.1997); *Bressler v. Fortune Magazine*, 971 F.2d 1226, 1228–29 (6th Cir.1992); *Newton v. National Broadcasting Co., Inc.*, 930 F.2d 662, 669–72 (9th Cir.1990); *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1128–29 (7th Cir. 1987). It does not constitute the proper standard of review which must be applied by the district courts when considering post-trial motions under Rule 50(b) and Rule 59. Defendant urges this Court to impermissibly stretch and extend the *Bose* rule of independent appellate review to the present situation where the defendant has made motions pursuant to Rule 50(b) and Rule 59 but there is no legal precedent for doing so. At least two federal courts have considered this particular question and determined that federal district courts are

not required to utilize the *Bose* rule of independent appellate review and engage in a *de novo* review of the jury's verdict or findings of fact on the issue of actual malice. *Nor–West Cable Communications v. City of St. Paul*, 924 F.2d 741, 745–46 (8th Cir.1991); *DiLeo v. Davis*, 1995 WL 143531 * 1 (E.D.La. March 29, 1995). This Court agrees with the Eighth Circuit's reasoning in *Nor–West Cable Communications*. In sum, *Bose* and its progeny, including *Cobb*, 278 F.3d 629, do not establish or even suggest that district courts should undertake an independent *de novo* review of jury verdicts on the question of actual malice.

■ Assuming *arguendo* that *Bose* and its progeny do require this district court to apply the standard of independent appellate review expressed in *Bose* and *Harte–Hanks* to the defendant's post-trial motions for judgment as a matter of law and a new trial on the question of actual malice, the defendant's motions are without merit and they will be **DENIED**. The Court has reviewed the entire record of evidence *de novo*. The jury's determinations concerning the credibility of witnesses have been reviewed utilizing a clearly erroneous standard because of the jury's opportunity to observe and evaluate the demeanor of the witnesses. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678; *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1239 (11th Cir.1999), *cert. denied*, 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000); *Newton*, 930 F.2d at 671. The Court concludes as a matter of law that there is more than sufficient evidence in the record to support the jury's verdict and to justify the jury's finding that the plaintiffs have proved actual malice by clear and convincing evidence. This Court has examined for itself the defamatory statements at issue and the circumstances under which they were published to determine whether the defamatory statements are "of a character which prin-

ciples of the First Amendment protect." *See Harte–Hanks*, 491 U.S. at 688–89, 109 S.Ct. 2678 (quoting *New York Times v. Sullivan*, 376 U.S. at 285, 84 S.Ct. 710). The evidence supports the jury's verdict and finding of actual malice.

Should the Court of Appeals be faced with making an independent determination regarding actual malice in this case, this Court suggests review of the following evidence:

(1) Testimony by Faith Logan that Media General intended to imply that West and FAPC were bribing local judges;

(2) Faith Logan's testimony that Media General employees were laughing about the "slicing and dicing" that they were doing to the videotapes;

(3) Evidence that one of Media General's editors wrote "End of Bitch" on the label of one of the videotapes, obviously referring to West;

(4) Evidence that Media General sliced and diced the videotape of James Clary to give what was shown on the air a very different meaning from what he actually said on the videotape;

(5) Evidence that Media General sliced and diced the interview of Tennessee State Court Judge Steven Daniel to make it appear that he was saying something that he clearly was not saying;

(6) Evidence that Media General made misrepresentations to Judge Daniel about the nature of the interview which he gave on videotape;

(7) Evidence that to falsely show that West and Sessions Judge Richard Holcomb had a "cozy" (read sexual) relationship, Media General made a phone call to Judge Holcomb's condominium in Florida to lure Mrs. Holcomb away in an attempt to permit Media General to surreptitiously film Judge Holcomb and

West together without Mrs. Holcomb's presence; and

(8) The inexplicable and inexcusable conduct of Media General, through its attorney, Donald Zachary, to fail to produce, until the eve of trial, the complete videotapes taken by Media General and failure to produce the "End of Bitch" tape until after the trial had already begun.

## IV.

### *Plaintiffs' Motion for Judgment as a Matter of Law and for Further Sanctions [Court File No. 169]*

■■■■■ Plaintiffs invite the Court to enter a judgment as a matter of law pursuant to FED. R. CIV. P. 50(b) in favor of the plaintiffs for punitive damages. The motion is **DENIED**. There was sufficient evidence to warrant the case going to the jury on punitive damages. However, the jury decided that punitive damages were not warranted. This decision was well within the jury's discretion. Under Tennessee law, the issue of whether or not to award punitive damages and, if so, the proper amount of punitive damages is pre-eminently for the jury to decide. The jury's discretion in fixing the amount of punitive damages is not completely beyond the Court's supervision. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901–902 (Tenn.1992); *Coppinger Color Lab, Inc. v. Nixon*, 698 S.W.2d 72, 74 (Tenn.1985); *Odom v. Gray*, 508 S.W.2d 526, 533 (Tenn. 1974) ("It is the duty of the Trial Court to determine whether there is material evidence which would justify the award of punitive damages but the allowance of such punitive damages is a matter of discretion with the jury.")

In reviewing the plaintiffs' Rule 50(b) motion, the Court is required to take the strongest legitimate view of the evidence in favor of the defendant, allow all reasonable inferences in the defendant's favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the evidence as a whole. A verdict should not be directed by the Court after trial except where an objectively reasonable mind could only reach but one conclusion. *Tschira*, 135 F.3d at 1087; *Holmes*, 551 S.W.2d at 685. Applying this standard of review, the plaintiffs' Rule 50(b) motion for judgment as a matter of law on punitive damages must be **DENIED**.

■■■■ Plaintiffs contend the Court has knowledge superior to that of the jury concerning additional wrongdoing by the defendant. Plaintiffs want the Court to enter a judgment under Rule 50(b) on their claim for punitive damages based on matters that were not presented to and not considered by the jury at trial. [Court File No. 170]. Plaintiffs do not cite, and this Court is not aware of, any law which authorizes the Court to follow such an extraordinary procedure. When deciding the plaintiffs' Rule 50(b) motion, the Court is limited to reviewing only the evidence presented to the jury at trial. The Court cannot grant a Rule 50(b) motion and set aside the jury's verdict based on information that was not introduced into evidence at trial and not taken into consideration by the jury.

■■■■ Beyond their Rule 50(b) motion, the plaintiffs renew their motion to impose additional sanctions upon the defendant. Plaintiffs move to strike any defenses to the punitive damages claim and enter judgment against the defendant awarding punitive damages. The plaintiffs' motion to impose further sanctions will be DENIED. The Court has already sanctioned the defendant at trial by granting the plaintiffs' motion *in limine* to exclude the videotape deposition of Chris Willis. [Court File No. 136; Transcript of Final Pretrial Conference pp. 4–22; Trial Tran-

script Vol. I, pp. 4–12]. Moreover, the Court sanctioned the defendant for its failure to timely produce videotapes during discovery by permitting the plaintiffs to present a defamation claim at trial predicated on the videotape interview of Clary and the defendant editing out or deleting Clary's statement that he had not observed probationers sleeping in the FAPC classes. This latter sanction was necessary and proper because the defendant either negligently or deliberately failed to produce the complete videotape of the Clary interview to the plaintiffs' counsel until the final pretrial conference.

The Court, in the exercise of its discretion, **DECLINES** to impose more sanctions upon the defendant. Plaintiffs now allege that the defendant committed other serious misconduct which warrants the imposition of more harsh sanctions. [Court File No. 170]. The Court expresses no opinion whether the plaintiffs' allegations of misconduct are true. Even if we assume *arguendo* that the plaintiffs' allegations are true, it does not warrant imposing the exceptionally harsh, drastic sanction proposed by the plaintiffs. The sanction sought by the plaintiffs, *i.e.*, striking all defenses to the claims for punitive damages and the Court awarding punitive damages against the defendant, would be disproportional to the defendant's alleged misconduct. Plaintiffs do not cite any legal precedent to support the proposition that the Court can override the jury's verdict and award punitive damages as a sanction.

A separate order will enter.

### ORDER

In accordance with the accompanying memorandum opinion, it is hereby **ORDERED**:

(1) The defendant's motion for judgment as a matter of law under FED. R. CIV. P. 50(b) [Court File No. 165] is **DENIED**;

(2) The defendant's motion for new trial or, in the alternative, motion for remittitur of damages pursuant to FED. R. CIV. P. 59(a) and (e) [Court File No. 167] is **DENIED**; and

(3) The plaintiffs' motion for judgment as a matter of law pursuant to FED. R. CIV. P. 50(b) on their claim for punitive damages and motion to impose further sanctions [Court File No. 169] are **DENIED**.